Filed 6/2/14

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S202724 |
| v. | ) | |
| | ) | Ct.App. 3 C063913 |
| BOBBY CHIU, | ) | |
| | ) | Sacramento County |
| Defendant and Appellant. | ) | Super. Ct. No. 03F08566 |
| _____ | ) | |

There are two distinct forms of culpability for aiders and abettors. "First, an aider and abettor with the necessary mental state is guilty of the intended crime. Second, under the natural and probable consequences doctrine, an aider and abettor is guilty not only of the intended crime, but also 'for any other offense that was a "natural and probable consequence" of the crime aided and abetted.' " (*People v. McCoy* (2001) 25 Cal.4th 1111, 1117 (*McCoy*).) This case involves the second form of aider and abettor culpability.

In this case, a jury found defendant, Bobby Chiu, guilty of first degree willful, deliberate and premeditated murder (premeditated murder), on the theory that either he directly aided and abetted the murder or he aided and abetted the "target offense" of assault or of disturbing the peace, the natural and probable consequence of which was murder. On the natural and probable consequences theory, the trial court instructed that the jury could find defendant guilty of first degree murder if it determined that *murder* was a natural and probable

consequence of either target offense aided and abetted, and if in committing murder, the perpetrator acted willfully, deliberately, and with premeditation.

The Court of Appeal held that the trial court erred in failing to instruct that the jury must find first degree *premeditated* murder was the natural and probable consequence of either target offense. If the jury relied on the natural and probable consequences theory to return the first degree murder conviction, it "necessarily convicted defendant of first degree murder simply because that was the degree of murder the jury found the perpetrator committed." Being unable to find the error harmless, it reversed defendant's first degree murder conviction.

Like the Court of Appeal, we find instructional error, but for a different reason. We now hold that an aider and abettor may not be convicted of first degree *premeditated* murder under the natural and probable consequences doctrine. Rather, his or her liability for that crime must be based on direct aiding and abetting principles. (See *McCoy, supra*, 25 Cal.4th at pp. 1117-1118.) Because the error here was prejudicial, we affirm the Court of Appeal's judgment reversing defendant's first degree murder conviction.

## I. FACTS AND PROCEDURAL HISTORY

On September 29, 2003, McClatchy High School students Sarn Saeteurn and Mackison Sihabouth argued over two girls in an instant message exchange. Saeteurn challenged Sihabouth to an after-school fight outside a pizzeria, Famous Pizza, the next day. Saeteurn told Sihabouth that he was going to bring his "homies" with him, and threatened to shoot Sihabouth's father if his father tried to stop the fight. Sihabouth called Simon Nim, a member of the Hop Sing gang, for help. Defendant Bobby Chiu also learned about the fight.

The next day, defendant told American Legion High School student Toang Tran about the fight. Defendant asked Tran if he "want[ed to] see someone get shot," told Tran that there was going to be a fight over a girl, and said his "friend"

2

would shoot if his "friend feels pressured." Sihabouth showed up for the fight but left after he saw a crowd. Saeteurn did not show up for the fight because he learned that Hop Sing members planned to be there and he believed they " 'are crazy and they kill people.' " Defendant and his friends, Tony Hoong and Rickie Che, went to Famous Pizza that day.

McClatchy High School student Teresa Nguyen met her boyfriend, American Legion student Antonio Gonzales, outside Famous Pizza the day of the fight. Defendant said something to Nguyen which she did not hear. Defendant snickered when Nguyen asked if he was mocking her. Nguyen told defendant to "shut up," and Gonzales left a conversation he was having with another friend to see what was the matter. Gonzales and defendant exchanged fighting words, and Gonzales walked toward defendant, who got off the trunk of the car on which he had been sitting with Hoong and Che. As Gonzales walked toward defendant, Gonzales's friend, Roberto Treadway, told Gonzales, "I got your back." Che and Hoong stood alongside defendant. After the groups exchanged more words and glared at one another, Che punched Treadway. Defendant swung at Gonzales, and Gonzales swung back. Defendant then tackled Gonzales and started hitting him while he lay on the ground. Soon, a full-scale brawl was underway, with as many as 25 people fighting. Gonzales's cousin, Angelina Hernandez, struck defendant eight or nine times in the head with her fists, allowing Gonzales to get off the ground and resume fighting defendant. Treadway's cousin, Joshua Bartholomew, also hit defendant hard in the back of the head soon after.

Bartholomew testified that after he struck defendant, he heard defendant tell Che to "[g]rab the gun." However, Gonzales, who had been fighting in close contact with defendant, did not hear defendant mention a gun. Soon, Bartholomew and Treadway attempted to leave the scene because they feared the police officer assigned to McClatchy High School could appear at any moment.

3

Hoong pulled out a pocket knife and stabbed Treadway in the arm. Che appeared with a gun he had retrieved from a car trunk and pointed it at Gonzales's face and said, "Run now, bitch, run." Gonzales ran. Che then pointed the gun at Bartholomew and Treadway. When he hesitated rather than shoot, defendant and Hoong yelled "shoot him, shoot him.' " Che shot Treadway dead. Che, defendant, and Hoong then fled together in a car.

Defendant testified that he heard about the fight the night before the incident. He claimed that he did not know that Che had a gun. He said he mocked Nguyen in an attempt to "hit on her." Defendant testified that during the fight with Gonzales, he felt continuous punches into the back of his head, received a blow to the face, and bled from his nose. Defendant denied calling for anyone to get a gun, and claimed that he did not want or expect Che to shoot Treadway.

The prosecution charged defendant with murder (Pen. Code, § 187, subd. (a)), with gang enhancement and firearm use allegations. At trial, the prosecution set forth two alternate theories of liability. First, defendant was guilty of murder because he directly aided and abetted Che in the shooting death of Treadway. Second, defendant was guilty of murder because he aided and abetted Che in the target offense of assault or of disturbing the peace, the natural and probable consequence of which was murder.

Regarding the natural and probable consequences theory, the trial court instructed that before it determined whether defendant was guilty of murder, the jury had to decide (1) whether he was guilty of the target offense (either assault or disturbing the peace); (2) whether a coparticipant committed a murder during the commission of the target offense; and (3) whether a reasonable person in defendant's position would have known that the commission of the *murder* was a natural and probable consequence of the commission of either target offense. (CALCRIM No. 403.)

4

The trial court instructed that to find defendant guilty of murder, the People had to prove that the perpetrator committed an act that caused the death of another person, that the perpetrator acted with malice aforethought, and that he killed without lawful justification. (CALCRIM No. 520.)

The trial court further instructed that if the jury found defendant guilty of murder as an aider and abettor, it had to determine whether the murder was in the first or second degree. It then instructed that to find defendant guilty of first degree murder, the People had to prove that the perpetrator acted willfully, deliberately, and with premeditation, and that all other murders were of the second degree. (CALCRIM No. 521.)

The jury found defendant guilty of first degree murder and the gang and firearm use allegations true.

As noted, the Court of Appeal reversed the first degree murder conviction. It held that the trial court erred in failing to instruct sua sponte that the jury must determine not only that the murder was a natural and probable consequence of the target crime, but also that the perpetrator's willfulness, deliberation, and premeditation were natural and probable consequences.

We granted the People's petition for review.

## II. DISCUSSION

Penal Code section 31, [1] which governs aider and abettor liability, provides in relevant part, "All persons concerned in the commission of a crime, whether it be felony or misdemeanor, and whether they directly commit the act constituting the offense, or aid and abet in its commission . . . are principals in any crime so committed." An aider and abettor is one who acts "with knowledge of the

---

[1] All statutory references are to the Penal Code.

5

criminal purpose of the perpetrator *and* with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense." (*People v. Beeman* (1984) 35 Cal.3d 547, 560.)

" 'A person who knowingly aids and abets criminal conduct is guilty of not only the intended crime [target offense] but also of any other crime the perpetrator actually commits [nontarget offense] that is a natural and probable consequence of the intended crime.' " (*People v. Medina* (2009) 46 Cal.4th 913, 920 (*Medina*), citing *People v. Prettyman* (1996) 14 Cal.4th 248, 260-262 (*Prettyman*).) "Thus, for example, if a person aids and abets only an intended assault, but a murder results, that person may be guilty of that murder, even if unintended, if it is a natural and probable consequence of the intended assault." (*McCoy, supra*, 25 Cal.4th at p. 1117.)

A nontarget offense is a "natural and probable consequence" of the target offense if, judged objectively, the additional offense was reasonably foreseeable. (*Medina, supra*, 46 Cal.4th at p. 920.) The inquiry does not depend on whether the aider and abettor actually foresaw the nontarget offense. (*Ibid.*) Rather, liability " 'is measured by whether a reasonable person in the defendant's position would have or should have known that the charged offense was a reasonably foreseeable consequence of the act aided and abetted.' " (*Ibid.*) Reasonable foreseeability "is a factual issue to be resolved by the jury." (*Id.* at p. 920.)

We have not previously considered how to instruct the jury on aider and abettor liability for first degree premeditated murder under the natural and probable consequences doctrine. In *People v. Favor* (2012) 54 Cal.4th 868 (*Favor*), we held that under the natural and probable consequences doctrine as applied to the premeditation allegation under section 664, subdivision (a) (section 664(a)), a trial court need only instruct that the jury find that attempted murder, not attempted *premeditated* murder, was a foreseeable consequence of the target

6

offense.  (*Id*. at p. 872.)  The premeditation finding — based on the direct perpetrator's mens rea —  is determined after the jury decides that the nontarget offense of attempted murder was foreseeable.  (*Id.* at pp. 879-880.)

Relying on *People v. Bright* (1996) 12 Cal.4th 652, 665-667, we reasoned that section 664(a), which imposes an increased punishment for an attempt to commit a murder that is willful, deliberate, and premeditated, was a penalty provision and did not create a greater offense or degree of attempted murder. (*Favor*, *supra*, 54 Cal.4th at pp. 877, 879.)  Relying on *People v. Lee* (2003) 31 Cal.4th 613, 616 (*Lee*), we held that the direct perpetrator's heightened state of mind would be a sufficient basis upon which to apply section 664(a)'s penalty provision to an aider and abettor under the natural and probable consequences doctrine.  (*Favor*, *supra*, 54 Cal.4th at p. 879.)

In *Lee*, we applied section 664(a)'s penalty provision to direct aiders and abettors.  Relying on its statutory language, we noted that section 664(a) "makes no distinction between an attempted murderer who is guilty as a direct perpetrator and an attempted murderer who is guilty as an aider and abettor" and does not require personal willfulness, deliberation, and premeditation of an attempted murderer.  (*Lee*, *supra*, 31 Cal.4th at p. 623.)  We observed that although the Legislature would have been justified in refusing to extend section 664(a)'s penalty provision to an aider and abettor who fails to personally act with premeditation, it did not.  Although *Lee* did not involve the natural and probable consequences doctrine, we commented in dictum that "where the natural-and-probable consequences doctrine does apply, an attempted murderer who is guilty as an aider and abettor may be less blameworthy.  In light of such a possibility, it would not have been irrational for the Legislature to limit section 664(a) only to those attempted murderers who personally acted willfully and with deliberation and premeditation.  But the Legislature has declined to do so." (*Lee*, at pp. 624-

7

625.)  Thus, we indicated in *Lee* that section 664(a) applies to all aiders and abettors.  (*Favor*, *supra*, 54 Cal.4th at p. 878.)

Relying on *Favor*, the People urge us to reach the same result here.  However, we find that case distinguishable in several respects.  Unlike *Favor*, the issue in the present case does not involve the determination of legislative intent as to whom a statute applies.  Also, unlike *Favor*, which involved the determination of premeditation as a requirement for a statutory penalty provision, premeditation and deliberation as it relates to murder is an element of first degree murder.  In reaching our result in *Favor*, we expressly distinguished the penalty provision at issue there from the substantive crime of first degree premeditated murder on the ground that the latter statute involved a different *degree* of the offense.  (*Favor, supra*, 54 Cal.4th at pp. 876-877.)  Finally, the consequence of imposing liability for the penalty provision in *Favor* is considerably less severe than in imposing liability for first degree murder under the natural and probable consequences doctrine.  Section 664(a) provides that a defendant convicted of attempted murder is subject to a determinate term of five, seven, or nine years.  If the jury finds the premeditation allegation true, the defendant is subject to a sentence of life with the possibility of parole.  (*Ibid*.)  With that life sentence, a defendant is eligible for parole after serving a term of at least seven years.  (§ 3046, subd. (a)(1).)  On the other hand, a defendant convicted of first degree murder must serve a sentence of 25 years to life.  (§ 190, subd. (a).)  He or she must serve a minimum term of 25 years before parole eligibility.  (§ 3046, subd. (a)(2).)  A defendant convicted of second degree murder must serve a sentence of 15 years to life, with a minimum term of 15 years before parole eligibility.  (§§ 190, subd. (a), 3046, subd. (a)(2).)

Finding *Favor* not dispositive, we turn to the statutory and doctrinal bases of the natural and probable consequence doctrine to determine its application.  The natural and probable consequences doctrine was recognized at common law and is

8

firmly entrenched in California law as a theory of criminal liability. (*Prettyman*, *supra*, 14 Cal.4th at pp. 260-261; *People v. Durham* (1969) 70 Cal.2d 171, 181-185 & fn. 11; cf. *People v. Kauffman* (1907) 152 Cal. 331, 334 [conspiracy liability]; see *Keeler v. Superior Court* (1970) 2 Cal.3d 619, 625 ["It will be presumed . . . that in enacting a statute the Legislature was familiar with the relevant rules of the common law, and, when it couches its enactments in common law language, that its intent was to continue those rules in statutory form"], superseded by statute on other grounds as stated in *People v. Taylor* (2004) 32 Cal.4th 863, 870.)

As noted, section 31 provides in relevant part that "[a]ll persons concerned in the commission of a crime, whether it be felony or misdemeanor, and whether they directly commit the act constituting the offense, or aid and abet in its commission . . . are principals in any crime so committed." It does not expressly mention the natural and probable consequences doctrine. Where the statutory language is vague, "the statutory definition permits, even requires, judicial interpretation." (*People v. Chun* (2009) 45 Cal.4th 1172, 1181.) We may, as a court, determine the extent of aiding and abetting liability for a particular offense, keeping in mind the rational function that the doctrine is designed to serve and with the goal of avoiding any unfairness which might redound from too broad an application. (See *Chun*, at pp. 1188-1189; *People v. Patterson* (1989) 49 Cal.3d 615, 622, 627 (lead opinion of Kennard, J.).)[2]

---

[2]     "[A]iding and abetting is one means under which derivative liability for the commission of a criminal offense is imposed. It is not a separate criminal offense." (*People v. Francisco* (1994) 22 Cal.App.4th 1180, 1190; accord, *People v. Brigham* (1989) 216 Cal.App.3d 1039, 1049, fn. 8.)

9

Aider and abettor culpability under the natural and probable consequences doctrine is vicarious in nature. (*People v. Garrison* (1989) 47 Cal.3d 746, 778 [accomplice liability is vicarious]; *People v. Croy* (1985) 41 Cal.3d 1, 12, fn. 5 ["The requirement that the jury determine the intent with which a person tried as an aider and abettor has acted is not designed to ensure that his conduct constitutes the offense with which he is charged. His liability is vicarious."]; *People v. Brigham, supra,* 216 Cal.App.3d at p. 1054 [aider and abettor is derivatively liable for reasonably foreseeable consequence of principal's criminal act knowingly aided and abetted].) "By its very nature, aider and abettor culpability under the natural and probable consequences doctrine is not premised upon the intention of the aider and abettor to commit the nontarget offense because the nontarget offense was not intended at all. It imposes vicarious liability for any offense committed by the direct perpetrator that is a natural and probable consequence of the target offense. [Citation.] Because the nontarget offense is unintended, the mens rea of the aider and abettor with respect to that offense is irrelevant and culpability is imposed simply because a reasonable person could have foreseen the commission of the nontarget crime." (*People v. Canizalez* (2011) 197 Cal.App.4th 832, 852, italics added.)

The natural and probable consequences doctrine is based on the principle that liability extends to reach "the actual, rather than the planned or 'intended' crime, committed on the *policy* [that] . . . aiders and abettors should be responsible for the criminal *harms* they have naturally, probably, and foreseeably put in motion." (*People v. Luparello* (1986) 187 Cal.App.3d 410, 439, italics added; see *Prettyman, supra*, 14 Cal.4th at p. 260, quoting *Luparello*.) We have never held that the application of the natural and probable consequences doctrine depends on

10

the foreseeability of every element of the nontarget offense.[3]  Rather, in the context of murder under the natural and probable consequences doctrine, cases have focused on the reasonable foreseeability of the actual resulting harm or the criminal act that caused that harm.  (See, e.g., *Medina*, *supra*, 46 Cal.4th at pp. 922, 928 ["shooting" or "escalation of the confrontation to a deadly level" was a foreseeable consequence of simple assault]; *People v. Ayala* (2010) 181 Cal.App.4th 1440, 1450 ["fatal shooting" was a natural and probable consequence of aiding and abetting an assault with a deadly weapon during a gang confrontation]; *People v. Gonzales* (2001) 87 Cal.App.4th 1, 10 ["fatal shooting" was a natural and probable consequence of a gang fight]; *People v. Olguin* (1994) 31 Cal.App.4th 1355, 1376) ["shooting" was a natural and probable consequence of assault and "escalation of this confrontation to a deadly level was much closer to inevitable than it was to unforeseeable"]; *People v. Rogers* (1985) 172 Cal.App.3d 502, 515 [" 'the natural and probable consequences of any armed robbery are that someone may be hurt, someone may be shot, [an] innocent bystander may be hurt' "].)

In the context of murder, the natural and probable consequences doctrine serves the legitimate public policy concern of deterring aiders and abettors from aiding or encouraging the commission of offenses that would naturally, probably, and foreseeably result in an unlawful killing.  A primary rationale for punishing such aiders and abettors — to deter them from aiding or encouraging the commission of offenses — is served by holding them culpable for the perpetrator's

---

[3]      Although our cases have referred generally to the foreseeability of the nontarget "crime" or "offense" (see, e.g., *Medina, supra*, 46 Cal.4th at p. 920; *Prettyman, supra*, 14 Cal.4th at pp. 261, 267, 269, 271), we were not called on in those cases to decide whether all of the elements of the nontarget offense must be foreseeable.

commission of the nontarget offense of second degree murder. (*People v. Knoller* (2007) 41 Cal.4th 139, 143, 151-152 [second degree murder is the intentional killing without premeditation and deliberation or an unlawful killing proximately caused by an intentional act, the natural consequences of which are dangerous to life, performed with knowledge of the danger and with conscious disregard for human life].) It is also consistent with reasonable concepts of culpability. Aider and abettor liability under the natural and probable consequences doctrine does not require assistance with or actual knowledge and intent relating to the nontarget offense, nor subjective foreseeability of either that offense or the perpetrator's state of mind in committing it. (*People v. Nguyen* (1993) 21 Cal.App.4th 518, 531 [inquiry is strictly objective and does not depend on defendant's subjective state of mind].) It only requires that under all of the circumstances presented, a reasonable person in the defendant's position would have or should have known that the nontarget offense was a reasonably foreseeable consequence of the act aided and abetted by the defendant. (*Ibid.*)

However, this same public policy concern loses its force in the context of a defendant's liability as an aider and abettor of a first degree premeditated murder. First degree murder, like second degree murder, is the unlawful killing of a human being with malice aforethought, but has the additional elements of willfulness, premeditation, and deliberation which trigger a heightened penalty. (*People v. Knoller, supra*, 41 Cal.4th at p. 151.) That mental state is uniquely subjective and personal. It requires more than a showing of intent to kill; the killer must act deliberately, carefully weighing the considerations for and against a choice to kill before he or she completes the acts that caused the death. (*People v. Koontz* (2002) 27 Cal.4th 1041, 1080; *People v. Anderson* (1968) 70 Cal.2d 15, 26-27.) Additionally, whether a direct perpetrator commits a nontarget offense of murder with or without premeditation and deliberation has no effect on the resultant harm.

12

The victim has been killed regardless of the perpetrator's premeditative mental state. Although we have stated that an aider and abettor's "punishment need not be finely calibrated to the criminal's mens rea" (*Favor, supra,* 54 Cal.4th at p. 878), the connection between the defendant's culpability and the perpetrator's premeditative state is too attenuated to impose aider and abettor liability for first degree murder under the natural and probable consequences doctrine, especially in light of the severe penalty involved and the above-stated public policy concern of deterrence.

Accordingly, we hold that punishment for second degree murder is commensurate with a defendant's culpability for aiding and abetting a target crime that would naturally, probably, and foreseeably result in a murder under the natural and probable consequences doctrine. We further hold that where the direct perpetrator is guilty of first degree premeditated murder, the legitimate public policy considerations of deterrence and culpability would not be served by allowing a defendant to be convicted of that greater offense under the natural and probable consequences doctrine. An aider and abettor's liability for murder under the natural and probable consequences doctrine operates independently of the felony-murder rule. (*People v. Culuko* (2000) 78 Cal.App.4th 307, 322.) Our holding in this case does not affect or limit an aider and abettor's liability for first degree felony murder under section 189.

Aiders and abettors may still be convicted of first degree premeditated murder based on direct aiding and abetting principles. (*McCoy, supra,* 25 Cal.4th 1111, 1117-1118.) Under those principles, the prosecution must show that the defendant aided or encouraged the commission of the murder with knowledge of the unlawful purpose of the perpetrator and with the intent or purpose of committing, encouraging, or facilitating its commission. (*Id*. at p. 1118.) Because the mental state component — consisting of intent and knowledge — extends to

13

the entire crime, it preserves the distinction between assisting the predicate crime of second degree murder and assisting the greater offense of first degree premeditated murder. (*McCoy, supra,* 25 Cal.4th at p. 1118 ["an aider and abettor's mental state must be at least that required of the direct perpetrator"]; cf. *Rosemond v. United States* (2014) 572 U.S. __, __ [134 S.Ct. 1240, 1248].) An aider and abettor who knowingly and intentionally assists a confederate to kill someone could be found to have acted willfully, deliberately, and with premeditation, having formed his own culpable intent. Such an aider and abettor, then, acts with the mens rea required for first degree murder.

Because we now hold that a defendant cannot be convicted of first degree premeditated murder under the natural and probable consequences doctrine, we must determine whether giving the instructions here allowing the jury to so convict defendant was harmless error. When a trial court instructs a jury on two theories of guilt, one of which was legally correct and one legally incorrect, reversal is required unless there is a basis in the record to find that the verdict was based on a valid ground. (*People v. Guiton* (1993) 4 Cal.4th 1116, 1128-1129; *People v. Green* (1980) 27 Cal.3d 1, 69-71.) Defendant's first degree murder conviction must be reversed unless we conclude beyond a reasonable doubt that the jury based its verdict on the legally valid theory that defendant directly aided and abetted the premeditated murder. (*People v. Chun*, *supra*, 45 Cal.4th at pp. 1201, 1203-1205.) We cannot so conclude.

The record shows that the jury may have based its verdict of first degree premeditated murder on the natural and probable consequences theory. During deliberations, the jury sent the trial court a note asking, "We are stuck on Murder I or Murder II due to personal views. What do we do?" While the court and counsel were discussing the note, the jury sent another note, stating, "We are at a stalemate."

14

The trial court then questioned several jurors. Some of the jurors stated that one juror was unable to follow or objected to the law relating to aiding and abetting. The foreman explained, "Well, she could not see [defendant] stepping in. Basically, the way we explained it was [defendant] stepping into Rickie Che's position as the murder happened, and she could not understand how he could be put into that position at that time with those circumstances that it happened after we had deliberated through what we thought was murder one or murder two which she went along with." Another juror also stated that the holdout juror said "something along the lines of not being able to put [defendant] in [Che's] shoes as the shooter."

The court then asked the holdout juror if she ever expressed the view that she could not put defendant in the perpetrator's shoes because she "object[ed] to the law that the Judge has given." She responded that she was bothered by the principle of aiding and abetting and putting an aider and abettor in the shoes of a perpetrator. The trial court removed the juror and replaced her with an alternate juror. The jury continued deliberating and found defendant guilty of first degree premeditated murder.

From the trial court's discussion with the jurors, it appears that the jury was deadlocked on whether defendant should be held guilty of first degree murder or of second degree murder. Also, it appears that the holdout juror could not find defendant guilty of first degree murder, being unable to place defendant in the "shoes of" Che, and thus could not attribute Che's premeditated murder to defendant. These events indicate that the jury may have been focusing on the natural and probable consequence theory of aiding and abetting and that the holdout juror prevented a unanimous verdict on first degree premeditated murder based on that theory. Thus, we cannot conclude beyond a reasonable doubt that

15

the jury ultimately based its first degree murder verdict on a different theory, i.e., the legally valid theory that defendant directly aided and abetted the murder.

The Court of Appeal found the trial court's instructions on murder relating to the natural and probable consequences doctrine to be error for reasons different than in our decision. However, the effect of the instructional error was the same, affecting only the degree of the crime of which defendant was convicted. Moreover, like us, the Court of Appeal determined there was no basis in the record to conclude that the verdict was based on the legally valid theory that defendant directly aided and abetted the murder. Regarding the remedy, the Court of Appeal reversed the first degree murder conviction, allowing the People to accept a reduction of the conviction to second degree murder or to retry the greater offense. That disposition is also appropriate under our decision. If the People choose to retry the case, they may seek a first degree murder conviction under a direct aiding and abetting theory.

### III. CONCLUSION

Accordingly, we affirm the judgment of the Court of Appeal.

**CHIN, J.**

**WE CONCUR:**

**BAXTER, J.**
**WERDEGAR, J.**
**CORRIGAN, J.**

16

**CONCURRING AND DISSENTING OPINION BY KENNARD, J.**


I agree with the majority's affirmance of the Court of Appeal's decision, which reverses the judgment convicting defendant of first degree murder. I disagree, however, with the majority's reasons for the affirmance.

As pertinent here, first degree murder requires that the killing be willful, deliberate, and premeditated, whereas second degree murder does not.[1] Defendant was convicted of first degree murder, not as the perpetrator but as an accomplice. An accomplice to a crime is guilty not only of the intended, or target, crime, but also of "any other offense that was a 'natural and probable consequence' of the crime aided and abetted." (*People v. Prettyman* (1996) 14 Cal.4th 248, 260 (*Prettyman*).)

An offense is the natural and probable consequence of a target crime if the perpetrator's commission of that nontarget offense was foreseeable by a reasonable person in the defendant accomplice's position. This court granted

\*      Retired Associate Justice of the Supreme Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

[1]      For convenience, I refer to willful, deliberate, and premeditated first degree murder, at issue here, as "premeditated murder" or "premeditated first degree murder." An unlawful killing is also first degree murder when it is committed with certain specified weapons; by poison, lying in wait, or torture; or when it occurs in the commission of certain specified felonies. (§ 189.) Here, however, there was no evidence that any of these circumstances applied.

review on the following question: Did the trial court here correctly instruct the jury that it could convict defendant of *first degree murder* under the natural and probable consequences rule if the jury found that some form of *murder*, irrespective of degree, was a natural and probable consequence of the target crime of either assault or disturbing the peace? I would hold, as did the Court of Appeal, that the trial court committed prejudicial error by instructing the jury that it could convict defendant as an accomplice to *first degree murder* under the natural and probable consequences rule without any need to determine whether the particular circumstances that elevated the murder to first degree were reasonably foreseeable.

The majority, however, sidesteps that question. Instead, the majority establishes a new exception to the scope of accomplice liability under the natural and probable consequences rule, holding that the rule does not apply to first degree murder (maj. opn., *ante*, at pp. 2, 13). As I explain, this court lacks the authority to create exceptions to rules governing criminal liability.

**I**

Defendant, a Sacramento high school student, was a member of Hop Sing, a local Asian street gang. He heard that two youths planned to have a fight on September 29, 2009, in front of a local pizza place. Defendant told a classmate about the upcoming fight and asked if the classmate "want[ed to] see someone get shot," adding that an unspecified friend of defendant's would use a gun if "pressured."

On September 29, a crowd of high school students gathered in front of the pizza place. Among them were defendant and two friends (Tony Hoong and Rickie Che) who, like defendant, were Hop Sing members. Also present were members of the Norteños, a Hispanic street gang. Defendant began arguing with Antonio Gonzales, a Norteño, and their friends gathered around them. When

2

defendant's friend Che punched Gonzales's friend Roberto Treadway, a Norteño, a fight broke out between Asian and Hispanic youths.

Treadway's cousin, Joshua Bartholomew, hit defendant and then heard defendant tell Che to "[g]rab the gun." Gonzales (who was fighting defendant at the time) did not hear this. When Treadway and Bartholomew tried to leave, defendant's friend Hoong stabbed Treadway in the arm. Che retrieved a gun from the trunk of a car, pointed it in Gonzales's face, and told him to run. Gonzales did so. Che then pointed the gun at Bartholomew and Treadway. When defendant and Hoong yelled "shoot him," Che shot and killed Treadway.

Defendant was charged with murder. At trial, he denied being a Hop Sing member, denied knowing that Che had a gun at the fight, denied telling Che to grab the gun, and denied telling Che to shoot. Defendant claimed he did not want or expect Che to shoot Treadway.

In closing argument to the jury, the prosecutor said that defendant was guilty of premeditated first degree murder based on two theories. First, the prosecutor argued that Che's killing of Treadway was premeditated first degree murder and that defendant, by telling Che to "grab the gun" and to shoot, was guilty of the same offense because he had encouraged Che to commit it. Second, the prosecutor argued that under the natural and probable consequences rule defendant was guilty of premeditated first degree murder because he had aided and abetted Che in committing the target crimes of assault and disturbing the peace; because some form of murder, irrespective of degree, was a natural and probable consequence of those target crimes; and because Che, the actual killer, committed premeditated first degree murder.

The trial court gave the jury this instruction on the natural and probable consequences rule: "Before you may decide whether the defendant is guilty of murder under a theory of natural and probable consequences, you must decide

3

whether he is guilty of the crime of assault or disturbing the peace. To prove the defendant is guilty of murder, the People must prove that: [¶] 1. The defendant is guilty of assault or disturbing the peace; [¶] 2. During the commission of assault or disturbing the peace, a co-participant in that assault or disturbing the peace committed the crime of murder, and [¶] 3. Under all of the circumstances, a reasonable person in the defendant's position would have known that the *commission of the murder* was a natural and probable consequence of the commission of the assault or disturbing the peace." (Italics added.) The court also instructed the jury that to prove defendant guilty of first degree murder the prosecution had to prove that the *perpetrator* acted willfully, deliberately, and with premeditation, but it did not tell the jury that it must find that a willful, deliberate, and premeditated act of murder was a natural and probable consequence of assault or disturbing the peace.

The jury convicted defendant of *first degree* murder. The Court of Appeal reversed the judgment of conviction. The court explained that the trial court committed prejudicial error by failing to instruct the jury that to convict defendant of *first degree murder* under the natural and probable consequences rule it must decide "whether a reasonable person in defendant's position would have known that premeditated murder (i.e., first degree murder) was likely to happen . . . as a consequence of either target offense." The Court of Appeal gave the prosecution a choice between retrying defendant for first degree murder and accepting a reduction of the conviction to second degree murder. This court granted the Attorney General's petition for review.

**II**

Penal Code section 31 (all later citations are to the Penal Code) states: "All persons concerned in the commission of a crime, . . . whether they directly commit the act constituting the offense, or *aid and abet* in its commission, . . . are

4

principals in any crime so committed." (Italics added.) Section 31 does not expressly define the term "aid and abet," but this court has described two types of accomplices who fall within the statutory definition: those who directly encourage or assist in the commission of the charged offense and those who are liable under the natural and probable consequences rule.

A defendant is a *direct* aider and abettor if " 'he or she, (i) with knowledge of the unlawful purpose of the perpetrator, (ii) and with the intent or purpose of committing, facilitating or encouraging commission of the crime, (iii) by act or advice, aids, promotes, encourages or instigates the commission of the crime.' " (*People v. Delgado* (2013) 56 Cal.4th 480, 486, quoting *People v. Cooper* (1991) 53 Cal.3d 1158, 1164.) *Indirect* liability of the aider and abettor, under the natural and probable consequences rule, is more complex, requiring a five-step process. The jury must find that "the defendant (1) with knowledge of the confederate's unlawful purpose; and (2) with the intent of committing, encouraging, or facilitating the commission of any target crime(s); (3) aided, promoted, encouraged, or instigated the commission of the target crimes." (*Prettyman*, *supra*, 14 Cal.4th at p. 271.) The jury must also find that "(4) the defendant's confederate committed an offense other than the target crime(s); and . . . (5) the offense committed by the confederate was a natural and probable consequence of the target crime(s) that the defendant encouraged or facilitated." (*Ibid*., italics omitted.) Requirements (4) and (5) are at issue here.

Under the natural and probable consequences rule, liability "is 'derivative,' that is, it results from an act by the perpetrator to which the accomplice contributed." (*Prettyman*, *supra*, 14 Cal.4th at p. 259.) A crime is the natural and probable consequence of an intended or target crime if its commission by the perpetrator was reasonably foreseeable. "The . . . question is not whether the aider and abettor *actually* foresaw the additional crime, but whether, judged objectively,

5

it was *reasonably* foreseeable." (*People v. Medina* (2009) 46 Cal.4th 913, 920.) "A reasonably foreseeable consequence is to be evaluated under all the factual circumstances of the individual case . . . and is a factual issue to be resolved by the jury." (*Ibid.*)

The Court of Appeal here agreed with defendant accomplice, as I do, that the trial court erred in its instructions to the jury. The jury was instructed that it could convict him of *first degree* murder under the natural and probable consequences rule simply by finding that some form of *murder* (irrespective of degree) was a natural and probable consequence of the target crimes of either assault or disturbing the peace that defendant had aided and abetted. Under the instructions, the jury was not required to decide whether *first degree murder* was a natural and probable consequence of the target crime.

As mentioned earlier (see p. 1, *ante*), to convict an accomplice defendant under the natural and probable consequences rule, the jury must find that "the *offense*" committed by the perpetrator was "a natural and probable consequence of the target crime that the defendant aided and abetted." (*Prettyman*, *supra*, 14 Cal.4th at p. 262, italics added.) Every offense is made up of factual elements, each of which must be proven by the prosecution to establish the commission of the offense. (*Richardson v. U.S.* (1999) 526 U.S. 813, 817.) Thus, under the natural and probable consequences rule, *every element* of the offense must be foreseeable to a reasonable person in the accomplice defendant's position. If *any* element is not reasonably foreseeable, the commission of the offense is not reasonably foreseeable.

Here, the jury convicted defendant of *first degree murder*, which, as pertinent here, is statutorily defined as a willful, deliberate, and premeditated killing with malice aforethought. (See fn. 1, *ante*.) But the trial court did not instruct the jury that to convict defendant accomplice of first degree murder the

6

jury must find that it was reasonably foreseeable that the actual perpetrator, Che, would commit a *premeditated* murder. Instead, the court essentially instructed the jury that it could convict defendant of *first degree* murder if *any* murder was reasonably foreseeable. Murder includes not only premeditated (first degree) murder, but also unpremeditated (second degree) murder. Thus, the trial court's instructions here permitted the jury, applying the natural and probable consequences rule, to convict defendant of premeditated first degree murder based on a conclusion that only second degree murder was a reasonably foreseeable consequence of the target crimes of either assault or disturbing the peace.

Insisting that the jury instructions were proper, the Attorney General contends that to convict an accomplice of first degree murder under the natural and probable consequences rule, the prosecution need not prove that the actual killer's *mental state* of premeditation (a requirement for first degree murder) was reasonably foreseeable; the prosecution, the Attorney General argues, need prove only that the perpetrator's *homicidal act* was foreseeable. Although the majority does not expressly say so, it appears to embrace the Attorney General's view. (See maj. opn., *ante*, at p. 11 ["cases have focused on the reasonable foreseeability of the actual resulting harm or the criminal act that caused that harm"].) I do not share that view. As this court has repeatedly held, the natural and probable consequences rule does not apply unless the perpetrator's *crime*, not just the perpetrator's *act*, is reasonably foreseeable. (See, e.g., *People v. Favor* (2012) 54 Cal.4th 868, 874; *People v. Pearson* (2012) 53 Cal.4th 306, 321; *People v. Medina* (2009) 46 Cal.4th 913, 920; *People v. Mendoza* (1998) 18 Cal.4th 1114, 1133; *Prettyman*, *supra*, 14 Cal.4th at pp. 254, 259, 261, 267, 269, 271; *People v. Croy* (1985) 41 Cal.3d 1, 12, fn. 5.) Because the mental state of premeditation is an element of first degree murder, an accomplice may be convicted of first degree murder under the natural and probable consequences rule only if the killer's

7

premeditation of the homicide was foreseeable by a reasonable person in the accomplice's position.

**III**

The majority sidesteps the question I discussed in the preceding section — that is, whether under the natural and probable consequences rule the jury here had to find that *each element* of premeditated first degree murder was reasonably foreseeable, or whether, as the Attorney General argues, only the actual perpetrator's homicidal *act* was reasonably foreseeable. Instead, the majority creates an exception to the natural and probable consequences rule, declaring that it can *never* be the basis for a first degree murder conviction. (Maj. opn., *ante*, at pp. 2, 13.) That exception was not sought by defendant, and thus it could not have been anticipated by the Attorney General. The majority's justifications for its newly created exception are unpersuasive, as explained below.

The majority says that imposing liability for *first degree* murder under the natural and probable consequences rule does not serve the purpose of that rule, which, according to the majority, is to "deter[] aiders and abettors from aiding or encouraging the commission of offenses that would naturally, probably, and foreseeably result in an unlawful killing." (Maj. opn., *ante*, at p. 11.) Noting that an unlawful killing is first degree murder only if it is premeditated, the majority observes: "That mental state is *uniquely subjective* and personal. It requires more than a showing of intent to kill; the killer must act deliberately, carefully weighing the considerations for and against a choice to kill before he or she completes the acts that caused the death. [Citations.] Additionally, whether a direct perpetrator commits a nontarget offense with or without premeditation and deliberation has *no effect on the resultant harm*." (Maj. opn., *ante*, at p. 12, italics added.) Thus, the majority concludes, "the connection between the defendant's culpability and the perpetrator's premeditative state is too attenuated to impose aider and abettor

8

liability for first degree murder under the natural and probable consequences doctrine." (Maj. opn., *ante*, at p. 13.)

The essence of the majority's reasoning is that premeditation is "uniquely subjective" and does not affect the "resultant harm." (Maj. opn., *ante*, at p. 12.) But the majority does not explain why malice is any less subjective, or has any greater effect on the resultant harm. Therefore, the majority's reasoning proves too much. It precludes not only a first degree murder conviction based on the natural and probable consequences rule, but also a second degree murder conviction based on that rule.

Yet the majority insists that holding defendants liable for second degree murder under the natural and probable consequences rule "serves the legitimate public policy concern of deterring aiders and abettors from aiding or encouraging the commission of offenses that would naturally, probably, and foreseeably result in an unlawful killing." (Maj. opn., *ante*, at p. 11.) Why is the mental state of malice foreseeable, but not the mental state of premeditation? The majority does not say. And why are the deterrent purposes of the natural and probable consequences rule served by applying it to second degree murder, but not to first degree murder? Again, the majority does not say.

When the California Legislature enacted the Penal Code in 1872, it said in section 31 that persons who "aid and abet" the commission of a crime are punishable as principals, but it left undefined the words "aid and abet." Because the natural and probable consequences rule has long been "an 'established rule' of American jurisprudence" (*Prettyman*, *supra*, 14 Cal.4th at p. 260) and was part of English common law (*ibid*), it is reasonable to infer that the 1872 Legislature intended to include that rule within the meaning of "aid and abet" as that phrase is used in section 31. But it is *not* reasonable to infer, as the majority impliedly does here, that the 1872 Legislature intended to apply the rule to every crime *except*

9

first degree murder. The majority makes no effort to tether that inference to anything in the common law, in this court's decisions preceding the Legislature's enactment of the Penal Code in 1872, or in the legislative history of section 31 to show a legislative intent to create a "first degree murder exception" to the applicability of the natural and probable consequences rule. What research *does* reveal is that for more than 40 years this court has upheld *first degree* murder convictions by juries instructed on the natural and probable consequences rule, without any hint that this might be legally problematic. (See, e.g., *People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 297-300; *People v. Richardson* (2008) 43 Cal.4th 959, 1021-1022; *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 106-108; *People v. Williams* (1997) 16 Cal.4th 635, 691; *Prettyman*, *supra*, 14 Cal.4th 248; *People v. Garrison* (1989) 47 Cal.3d 746, 777-778; *People v. Bunyard* (1988) 45 Cal.3d 1189, 1231-1232; *People v. Durham* (1969) 70 Cal.2d 171, 181-185.)

In the majority's view here, the punishment for second degree murder (imprisonment for 15 years to life) is "commensurate with a defendant's culpability for aiding and abetting a target crime that would naturally, probably, and foreseeably result in a murder." (Maj. opn., *ante*, at p. 13; see *id.* at p. 8.) But as this court has repeatedly stated, "in our tripartite system of government it is the function of the legislative branch to define crimes and prescribe punishments, and . . . such questions are in the first instance for the judgment of the Legislature alone," not the judiciary. (*In re Lynch* (1972) 8 Cal.3d 410, 414; see *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497, 516 [" 'the power to define crimes and fix penalties is vested exclusively in the legislative branch' "].) It is thus for the Legislature, not this court, to determine whether a defendant who aids a target crime that naturally and probably results in first degree murder deserves a

10

prison sentence of 25 years to life (the punishment for first degree murder) or 15 years to life (the punishment for second degree murder).

## IV

The trial court's instructional error here requires reversal of defendant's first degree murder conviction. In the words of the Court of Appeal, with which I agree: "[T]he instructions were deficient because they failed to inform the jury it needed to decide whether first degree murder, rather than just 'murder,' was a natural and probable consequence of the target offense. The absence of such an instruction means that if the jury used the natural and probable consequences theory to return the first degree murder conviction, the jury necessarily convicted defendant of first degree murder simply because that was the degree of murder the jury found the perpetrator committed, and the jury never determined whether a reasonable person in defendant's position would have known that premeditated murder (i.e., first degree murder) was likely to happen . . . as a consequence of either target offense. Because this possibility exists, we must reverse defendant's first degree murder conviction. When a trial court instructs a jury on two theories of guilt, one of which was legally correct and one legally incorrect, reversal is required unless there is a basis in the record to find that the verdict was actually based on a valid ground. (*People v. Guiton* (1993) 4 Cal.4th 1116, 1126-1129.) There is no such basis here, as it is impossible for us to determine from the instructions given, the verdict returned, or other circumstances of the case on which theory the jury based its first degree murder conviction."

11

I would affirm the Court of Appeal's judgment.


KENNARD, J.*

WE CONCUR:

CANTIL-SAKAUYE, C. J.
LIU, J.

---

\*     Retired Associate Justice of the Supreme Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

12

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Chiu
_____

**Unpublished Opinion** XXX NP opn. filed 4/23/12, 3d Dist.
**Original Appeal**
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S202724
**Date Filed:** June 2, 2014
_____

**Court:** Superior
**County:** Sacramento
**Judge:** Lloyd G. Connelly

_____

**Counsel:**

Scott Concklin, under appointment by the Supreme Court, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Donald E. de Nicola, Deputy State Solicitor General, Carlos A. Martinez, Eric L. Christoffersen and Jennevee H. de Guzman, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Scott Concklin
2205 Hilltop Drive, No. PMB-116
Redding, CA  96002
(530) 243-8510

Jennevee H. de Guzman
Deputy Attorney General
1300 I Street, Suite 125
Sacramento, CA  94244-2550
(916) 327-1145

2