Filed 2/13/26  In re Martinez CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re<br><br>LUIS MARTINEZ<br><br>on<br><br>Habeas Corpus. | B345970<br><br>(Los Angeles County<br>Super. Ct. No. KA088341) |

ORIGINAL PROCEEDINGS; petition for habeas corpus. H. Clay Jacke II, Judge.  Petition granted.

Eric R. Larson for Petitioner.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Steven D. Matthews and Gary A. Lieberman, Deputy Attorneys General for Respondent.

Petitioner Luis Martinez petitions for habeas relief under *People v. Chiu* (2014) 59 Cal.4th 155 (*Chiu*), which held an aider and abettor may not be convicted of first degree murder under the natural and probable consequences doctrine.  He contends, and the People agree, the record does not establish beyond a reasonable doubt he was convicted of first degree murder under another, valid theory of liability.  We grant the petition and remand to the trial court so the People may decide whether to retry petitioner on the first degree murder charge or accept a reduction of the conviction to second degree murder.

**FACTS**

A.    ***The Murder***

On April 17, 2009, eighteen-year-old Le Blanc went to a large party in Pomona with friends.[1]  The boys were not familiar with Pomona.  They learned about another party in Pomona through a "party text."  They were not able to find the party, but as they were driving they saw a bunch of kids parking cars and walking down the street.  The boys asked if there was a party and were told there was, so they decided to park and go to the party.

The party was held at Leslie C.'s house.  She asked her adult cousin, Deborah M., to help her set up the party and to arrange for security.  Leslie C. wanted to exclude certain boys from the party, including Martinez, Adam Delgado, Victor

---

[1] The party was attended by teenagers mostly between the ages of 13 and 19 years old, so we refer to the party-goers using terms that describe minors.  Martinez was 15 years old at the time.  No disrespect is intended.

2

Guillen, Edgar Cisneros, and "their . . . crowd" because they were "troublemakers." Deborah M.'s boyfriend, Joshua R., who worked as a security guard at a nightclub, provided security along with two other people. The party was held in Leslie C.'s back yard. The kids entered through the front gate where security was stationed. No one was allowed inside the house. Deborah M. mostly stayed inside with her young son and Leslie C.'s mother.

Deborah M. was at the front gate talking to Joshua R. when Le Blanc arrived. Le Blanc seemed cheerful and excited to go to the party. Le Blanc was one of the few Black people there. The majority of the party-goers were Hispanic. By the time Le Blanc arrived, the backyard had become very crowded. Martinez and the other boys that Leslie C. had intended to exclude tried to enter through the front door of the house, but a girl slammed the door shut. The boys went to look for another entrance. Leslie C. called security, but security was unable to find Martinez and the other boys.

Le Blanc tried to dance with several girls unsuccessfully. A Hispanic boy who was wearing a jacket with "Pomona" written on it walked up to Le Blanc. The boy pointed to a tattoo on his neck and asked Le Blanc if he had seen it. Le Blanc told the boy he did not want any problems and then walked away.

Later, Le Blanc was in the dance area of the backyard surrounded by Martinez, Guillen, Cisneros, and Ralph Alfaro. The boys started arguing with Le Blanc. The argument escalated and Delgado punched Le Blanc in the face. Le Blanc pulled out a gun and waved it around. Le Blanc then asked "if anyone wanted to fuck with him now." People began to run and yell "He has a gun."

Someone in the crowd yelled "He can't shoot us all.  Get him."  Multiple people yelled "Get that [derogatory racial epithet]!" and "Kill that [derogatory racial epithet]!" several times.  Delgado grabbed a piece of construction wood and shouted "Fuck that [derogatory racial epithet]!"  Le Blanc ran toward the front gate.  A large group of people, including Martinez, Delgado, and Alfaro chased Le Blanc.  The mob knocked Le Blanc down on the front stairs, and punched and kicked him.

Deborah M. had seen Le Blanc waving the gun in the backyard through the window.  She was afraid for her son and ran to the side door to lock it.  Deborah M. initially saw approximately 10 to 13 guys attacking Le Blanc.  More people were behind them, rushing forward to join the attack.  Le Blanc was hunched over on the front steps.  He was on his knees surrounded by a group of male Hispanics.  Deborah M. testified that "[t]hey were around him punching him, kicking him, just beating the life out of him."  Martinez admitted that he was in the group.  He participated in the beating and punched Le Blanc more than twice while Le Blanc was cowering on the stairs.  Deborah M. went outside, "because here's this guy on the front steps covering himself, and it's just so many guys just beating the life out of him."  She testified that they were yelling "Oh, get that [derogatory racial epithet].  Get that [derogatory racial epithet].  Get that [derogatory racial epithet].  That's what he gets.  Get him.  Get him.  Don't let him get away."  "They were punching him with closed fists, to the point where you could hear as they were punching him the thud sounds.  Like, when you hit somebody really hard and it just makes that sound on flesh, you could hear it.  And they were just kicking and just beating him really bad."  Deborah M. saw the mob stomping on Le Blanc.

Le Blanc had his hands over his head.  Deborah M. could see Le Blanc's hands clearly.  He was not holding the gun.

Deborah M. screamed for the mob to stop, but the beating continued.  She was able to push some people back and help Le Blanc.  The males were hitting her as she was trying to free Le Blanc from the crowd.  Leslie C.'s mother came outside and tried to help Deborah M.  One of the males swung his fist at Deborah M.'s head.  She moved her face out of the way and the blow hit her arm and her aunt's thigh.  Deborah M. was able to pull Le Blanc up and push the gate open.  She screamed at Le Blanc to run.  The crowd pushed Deborah M. back.  Le Blanc looked exhausted, but he was able to run down the street.  A group of males, including Martinez, chased after him.  Deborah M. later identified for the police approximately 20 of the people who were involved in the beating.  All of the people she identified were Hispanic males.

As Le Blanc fled, someone called Deborah M. a "[derogatory racial epithet] lover" and another person threw a glass bottle at her and hit her feet.  Deborah M. testified, "I got scared, because I thought that what had happened to [Le Blanc], they would start doing to me.  So I backed off."  She was afraid that the mob was so angry that they would come back and turn on her after they "got" Le Blanc.  Deborah M. went to close and lock the gate so that no one could get in or out.  As she did so, she tripped over the gun that Le Blanc had been waving in the back yard.  Joshua R. picked up the gun and took it away. Deborah M. saw a male running back from the direction the mob had gone.  He retrieved what looked like a gun from a car parked across the street and ran back toward the mob.

Sandra A. lived down the street from Leslie C. She and her husband, Pablo A., heard screaming and looked out the window to see what was happening. Sandra A. saw a group of 20 to 30 kids running in the street toward her house. They gathered in one area and a fight broke out. Everyone in the group was attacking one kid—Le Blanc—kicking and hitting him. Pablo A. estimated that there was a group of 20 to 25 people beating Le Blanc. Sandra A. testified, "They were . . . hitting him, just—there was just so many of them, and again, it was just shocking to see all that happening." Le Blanc was lying on the ground and appeared unconscious. Sandra A. saw a male pull out a gun and shoot Le Blanc. The male got into a dark SUV and drove away.

Party-goer Arturo C. followed the mob down the street. Arturo C. saw Alfaro knock Le Blanc to the ground. Le Blanc was defenseless and unable to fight back. Le Blanc got "stomped" by 15 to 20 people after he was on the ground. Arturo C. stole Le Blanc's shoes as Le Blanc was being beaten. He saw Delgado stab Le Blanc in the chest. Earlier in the evening, Delgado had shown Arturo C. a pocket knife and told him not to worry if anything happened because he had the knife. As Arturo C. was leaving he heard gunshots.

Deborah M. also heard a gunshot. She heard someone yell, "Pomona, Pomona." Several people were yelling, " 'They're coming back. They're come back. They have a gun. They have a gun.' " Girls were screaming and running.

When he arrived at the scene, City of Pomona Police Officer Melvon Bird saw 30 to 40 kids running away. Le Blanc was lying face down on the side of the road with his feet up on the sidewalk. Le Blanc did not appear to be breathing and did not respond to the officer. There was a bullet casing next to his head. Officer

Bird felt for a pulse and found none. He saw that there was blood in Le Blanc's ears and a puddle of blood under his head. The officer called for paramedics.

## B. *Cause of Death and Injuries*

Deputy Medical Examiner Dr. Lisa Scheinin of the Los Angeles County Coroner's Office determined that the cause of Le Blanc's death was a combination of stabbing and gunshot wounds. He was stabbed three times, including a stab to the heart. After the stabbing, Le Blanc was turned face down and shot once through the back of the head. In addition to the stabbing and gunshot wounds, Le Blanc suffered multiple head injuries, including abrasions, contusions, and shallow lacerations. His nasal bridge and ear cartilage were fractured. Dr. Scheinin opined that Le Blanc likely suffered the injuries as a result of being kicked in the head and stomped on the face. She opined that it requires significant force to break cartilage.

## C. *Gang Evidence*

City of Pomona Police Officer Greg Freeman testified that the 12th Street gang (12th Street) is the largest Hispanic gang in Pomona. Officer Freeman explained that the Hispanic gangs in Pomona are "very territorial," and that the party was within 12th Street territory. 12th Street is notorious for its hatred of Black people. The officer explained that members of a gang are people who live for the gang. They have no other job and are focused on bettering the gang at all times. Associates are people who have a life outside the gang that may include a job or school but "when

7

they're called upon by the gang, they drop everything" and go to assist the gang.  Tagging crews are bonded groups of younger people who operate within a gang's territory and are a source of future recruits for the gang.  Tagging crews commit crimes that benefit the gang.  The Tinto Killers (Tinto Killers) or TK is a tagging crew that operates within 12th Street's territory.  "Tinto Killers" means Black Killers.  MBK is another tagging crew that feeds into 12th Street.  12th Street engages in a wide variety of criminal offenses; one of their major activities is murder.  Gang members increase respect for their gang by committing crimes.  A 12th street member would garner the most respect for killing a Black person.  12th Street is also known as "Pomona 12th Street" and "The Sharkies Gang."  Their symbols include sharks, the letter "P", the number "12", and "P-12."

Given hypothetical facts that mirror this case and a prior contact that Officer Freeman had with Martinez, Officer Freeman opined that the person in the hypothetical was "at least an associate" of the hypothetical gang.  Guillen and Cisneros were both members of 12th Street.  Delgado was a member of MBK in 2009, but belonged to 12th Street by the time of trial.  Alfaro was a member of Tinto Killers in 2009, and later became a 12th Street member.

Arturo C. also knew Alfaro to be a member of Tinto Killers.  He said that many people involved in the beating were members of Tinto Killers.

**D.**   ***Martinez's Interview with Police***

In an interview with police, Martinez initially said that he did not go into the back yard when he arrived at the party

8

because there was a fight starting.  After he was confronted with information about his participation in the beating, Martinez was more forthcoming.

Martinez confirmed that there was a Black male in the dance area and that people around the Black male (Le Blanc) were starting a fight.  Delgado, Guillen, Cisneros, and Alfaro were part of the group fighting with Le Blanc.  Things became heated and Le Blanc pulled out a gun.  Delgado punched Le Blanc in the face.  Someone in the crowd yelled "He can't shoot us all.  Get him."  Le Blanc ran for the gate.

Martinez, Delgado, and Alfaro gave chase.  Le Blanc was knocked down on the stairs, punched, and kicked.  Martinez admitted that he punched Le Blanc more than twice while Le Blanc was cowering on the stairs.  He described the beating in the same terms that Deborah M. had—he said that Le Blanc was kicked, punched, and "stomped out."

Martinez admitted that he was part of the mob that chased Le Blanc after he fled through the gate.  Martinez, Alfaro, Delgado, Cisneros, and Prado led the pack.  Alfaro knocked Le Blanc to the ground and the beating continued.  Le Blanc appeared to be unconscious to Martinez as Le Blanc's eyes were closing.  Delgado stabbed Le Blanc twice in the upper torso.  Alfaro stood over Le Blanc and shot him once.

Martinez denied assaulting Le Blanc after he chased him from the stairs.  He told police that Delgado was a member of 12th Street and Alfaro was a Tinto Killer.

# PROCEDURAL HISTORY

The People tried Martinez for first degree murder on two theories—(1) direct aiding and abetting and (2) aiding and abetting under the natural and probable consequences doctrine. The People did not allege that Martinez stabbed or shot Le Blanc. He was charged based on his role in the mass beating.

The jury found Martinez guilty of first degree murder. The jury further found that the murder was committed for the benefit of a criminal street gang (Pen. Code, § 186.22, subd. (b)(1)(C))[2], and that a principal personally and intentionally discharged a firearm proximately causing the victim's death (§ 12022.53, subds. (d), (e)(1)). The trial court sentenced Martinez to 50 years to life in state prison. Another panel of this court affirmed the judgment.

Shortly after issuance of remittitur, our Supreme Court held in *Chiu, supra,* 59 Cal.4th 155 that an aider and abettor may not be convicted of first degree premeditated murder under the natural and probable consequences doctrine. Alfaro and Prado's convictions, which were not yet final at the time, were reversed under *Chiu* and their cases remanded to the trial court. (*People v. Prado et al.* (Jan. 13, 2015, B243204 [nonpub. opn.].) The People elected not to retry Alfaro and Prado, and their convictions were reduced to second degree murder.

Martinez sought similar relief by way of a motion to recall the remittitur. We denied the motion in an order noting "[d]efendant remains free to litigate the instructional error contention in a habeas corpus petition filed in the trial court."

---

[2] All further statutory references are to the Penal Code.

10

(*People v. Martinez* (Oct. 24, 2014, B242710) [nonpub. order].) No such petition was filed.

In February 2019, Martinez petitioned to be resentenced under former section 1170.95, now section 1172.6. The People opposed the petition. The trial court appointed counsel, held an evidentiary hearing pursuant to section 1172.6, subdivision (d)(3), and denied the petition, finding the People had met their burden of proving beyond a reasonable doubt that Martinez was guilty of aiding and abetting implied malice murder. We affirmed. (*People v. Martinez* (Apr. 22, 2025, B336031) [nonpub. opn.].)

On May 7, 2025, petitioner filed a habeas petition seeking relief under *Chiu*. In a return to our order to show cause why relief should not be granted, the People conceded petitioner's conviction for first degree murder should be reversed under *Chiu* and ask us to remand the matter to the trial court so the People may retry the first degree murder charge or accept a reduction to second degree murder. We agree and now grant the petition.

## DISCUSSION

Our Supreme Court held in *Chiu* that "natural and probable consequences liability cannot extend to first degree premeditated murder because punishing someone for first degree premeditated murder when that person did not actually perpetrate or intend the killing is inconsistent with 'reasonable concepts of culpability.' " (*Chiu, supra,* 59 Cal.4th at p. 165.) This holding is retroactive to convictions already final at the time *Chiu* was decided. (*In re Martinez* (2017) 3 Cal.5th 1216, 1222.)

11

"When a trial court instructs a jury on two theories of guilt, one of which was legally correct [e.g., direct aiding and abetting] and one legally incorrect [i.e., natural and probable consequences], reversal is required . . . unless we conclude beyond a reasonable doubt that the jury based its verdict on the legally valid theory that defendant directly aided and abetted the premeditated murder." (*Chiu, supra,* 59 Cal.4th at p. 167; see also *In re Lopez* (2023) 14 Cal.5th 562, 568 ["a reviewing court may hold the error harmless where it would be impossible, based on the evidence, for a jury to make the findings reflected in its verdict without also making the findings that would support a valid theory of liability"].)

Although the attack was vicious, we cannot say beyond a reasonable doubt the jury convicted Martinez of first degree murder based on a direct aiding and abetting theory. In closing arguments, the prosecutor relied heavily upon a natural and probable consequences theory of liability, telling the jury that Martinez "and all of the others who participated in the assault fit squarely within the definition of natural and probable consequences defined by the law" and that "[y]ou couldn't get a factual scenario more suited to the theory of natural and probable consequences than this one."

## DISPOSITION

The petition for writ of habeas corpus is granted.  On remand, the People may elect to retry the first degree murder charge or accept a reduction of the conviction to second degree murder.

NOT TO BE PUBLISHED.


MOOR, J.

We concur:


BAKER, Acting P. J.


KIM (D.), J.