Filed 2/10/15  P. v. Salazar CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G048144 |
| v. | (Super. Ct. No. 09NF3148) |
| DYLAN WILLIAM SALAZAR, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Thomas M. Goethals, Judge.  Affirmed in part, reversed in part, and remanded.

Christine Vento, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, William M. Wood, Meagan Beale and Marilyn L. George, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

Defendant Dylan William Salazar was charged with a number of felonies arising out of two gang-related incidents. He was 17 years old at the time of the charged offenses. His opening brief raised seven issues on appeal. He subsequently filed a request for this court to take judicial notice of the trial transcript of a separately tried codefendant. Concurrently, he filed a request to file a supplemental opening brief raising four additional issues. We granted both requests. Defendant contends reversal is required because: (1) the evidence does not support his conviction for active participation in a criminal street gang (Pen. Code,[1] § 186.22, subd. (a)) in count five because he was acquitted of the underlying felony; (2) the trial court erred in responding to a jury request; (3) the court erred in instructing the jury; (4) counsel was ineffective in stipulating to certain facts; (5) his sentence of 50 years to life violates the Eight Amendment's prohibition against cruel and unusual punishment; (6) newly enacted section 3051 (juvenile sentenced to life in prison is entitled to parole eligibility hearing after 15 years) does not make defendant's sentence constitutional; (7) differences in parole eligibility of juveniles sentenced to life and those sentenced to life without the possibility of parole (LWOP) violates equal protection; (8) the court abused its discretion in denying defendant's new trial motion; (9) counsel was ineffective in failing to investigate the testimony of a defense witness; (10) substitute counsel was ineffective for failing to investigate in preparation of new trial motion; and (11) the murder conviction must be reversed pursuant to our Supreme Court's recent decision in *People v. Chiu* (2014) 59 Cal.4th 155 (first degree murder conviction cannot be based on natural and probable consequences theory). We conclude his murder conviction (count one) and the sentencing allegations attached to that count must be reversed (*People v. Chiu*, *supra*, 59 Cal.4th 155), as must defendant's conviction on count five for active gang participation,

---

[1] All statutory references are to the Penal Code unless otherwise stated.

due to instructional error.  We otherwise affirm the judgment and remand the matter for retrial on counts one and five.

I

FACTS AND PROCEDURAL BACKGROUND

Counts one, two, and three of the information were based on the events of September 13, 2009, and counts four and five were based on events that took place two days earlier on September 11, 2009.  The information charged defendant, Alex Bryan Vilchis, and Jose Pedro Bautista with murder (§ 187, subd. (a); count one), conspiracy to commit an aggravated assault (§ 245, subd. (a)(1); count two), and active participation in a criminal street gang (§ 186.22, subd. (a); count three).  A special circumstance (§ 190.2, subd. (a)(22)) and a firearm use allegation (§ 12022.53, subds. (d), (e)(1)) were alleged in connection with the murder, and it was alleged the murder and the conspiracy were committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)).

Defendant and Bautista were charged in count four of the information with the attempted murder of Joseph Martinez, (§§ 664, subd. (a), 187, subd. (a)), and defendant was charged in count five with active participation in a criminal street gang.  The attempted murder was alleged to have been committed for the benefit of a criminal street gang.

The trials of defendant and Vilchis were severed.  Defendant's trial was scheduled to be heard first.  Bautista did not go to trial.  He entered into a plea agreement in exchange for his testimony against Vilchis.

*September 13, 2009 (Counts One, Two, and Three)*

On September 12, 2009, Lauro Nathaniel Avalos (Nate) was having a backyard 19th birthday party at his mother and stepfather's home in Buena Park.  There were anywhere from 30 to 100 people present at 11:00 p.m.  A disk jockey played music and there was dancing.  About 11:45 p.m., a group of at least five bald-headed Hispanic

3

males, including defendant, wearing gang attire crashed the party. As soon as they entered the backyard, trouble started. Racial epithets were made toward the Black guests and bottles were thrown. Nate did not know the Black guests were members of the Del Monte Crips. Nate's stepfather, George Springer, tried to calm things down, but Nate's mother, Juanita Arriola, was hit by a bottle and Springer told the defendant's group to leave.

As Springer and Nate walked the five to eight Hispanic males out of the backyard to the front of the residence, words were exchanged. The males "were just talking trash and like F-U and things like that." One in the group said, "Just stop. Get a good look at him so we know who to come back" and shoot. Nate identified defendant as the one in the group who "was more talkative and just antagonizing." At one point, someone in the group of Hispanic males called out, "Barrio Pobres." Springer responded, "I'm from Inglewood. I know what you guys are like. Just get out of here."

When the males left, Nate returned to the party and Springer went to his truck where he kept his nine-millimeter semiautomatic. Springer put the gun in his waistband. Nate's mother, aunt, and uncle, told Springer he did not need a gun, but Springer said he would protect his family.

Within 15 minutes, Nate was in the backyard when he heard "a really loud bang" that sounded like a gunshot. He ran to the front yard and saw a flash. Springer was on his knees, holding his gun, and losing consciousness. When Nate got to Springer, Springer was not pointing the gun at anyone. It was on the ground, as if it was too heavy for Springer to hold up.

Eddie Rosado was at the party that night. He saw one of the party crashers throw a bottle toward the Black guests. A friend of Rosado got cut and was cleaning his wound. Rosado and two other friends went out to their car to wait for their friend who had been cut. Rosado saw a car pull up in the middle of the road. Three male Hispanics got out of the car and ran toward the front yard of the house where the party was. Rosado

4

heard, "We told you we don't f. . . around," and then gunshots. Rosado identified defendant as one of the three Hispanic males.

Nancy Gutierrez attended the party with her friend Myra and Myra's brother. She saw the bottle throwing incident. Once Springer and Nate escorted the defendant's group out, Gutierrez told Myra they should leave because the party was likely to end because of the fight. Gutierrez and Myra left, but Myra's brother had the car keys and was still in the party, so Gutierrez went back to get the keys. Myra stayed by the car. Gutierrez told Myra's brother it was time to leave.

Gutierrez started back to the car and saw three cars pull up in front of the house. She did not see anyone get out of the cars, but she saw defendant approach the house carrying a gun in his hands. Gutierrez got in front of him to stop him because she knew Myra's brother would be coming that way very shortly and she did not want Myra's brother to get shot. Defendant had the gun in both hands toward his waist. Gutierrez was face-to-face with defendant. Crying, she told defendant not to kill Myra's brother. Defendant ignored her. She turned and saw Myra's brother was already walking to the sidewalk. She ran to him and told him to run because shooting was about to start. She heard gunshots as they ran to the car.

Days later, police showed Gutierrez a number of photographs. She identified a photograph of defendant as the person with the gun.

Springer died of a shotgun wound to the left side of his abdomen. He bled to death as the result of six entry and two exit wounds. The shotgun had been fired from a distance of one to 10 feet.

*September 11, 2009 (Counts Four and Five)*

Joseph Martinez was a sophomore in high school in September 2009. After school on September 11, 2009, Martinez took the bus and went to a Jack in the box restaurant with his friend Daniela Corona. They ate at a table by the door to the

5

restaurant. There were "a bunch of people" outside the Jack in the box because it was a popular place for students to go after school. Martinez noticed two girls who stood out. They were wearing what he characterized as gangster dress: high white socks and checkered shorts. Two males dressed similarly joined them and the group started staring at Martinez. Martinez recognized one of the females and one of the males. He recognized the male because the male was a member of the Barrio Pobre gang and Martinez was also in a gang (Anaheim Tears of a Clown) at that time, although he subsequently moved away and was no longer with any gang.

Martinez knew the staring meant there would be a fight. The males motioned for him to come outside. According to Martinez, the males knew him. He left the Jack in the box even though he knew the two males and three females were waiting for him. He exchanged words and began fighting with one of the males, after throwing the first punch. Martinez felt more than one person striking him. He was struck three or four times by the male he started fighting, received two or three hits from another before he fell, and four or five after he was on the ground. The girls hit him too. He does not remember what happened after he insulted his attackers for jumping in to help their friend. He lost consciousness.

Corona watched the fight. She said Martinez was kicked while on the ground. When Martinez was no longer moving, his attackers ran away. She went to check on Martinez. He was bloody and unconscious, so she called 911.

Martinez was taken to the hospital by ambulance. Martinez suffered a cut to his head and a couple of holes in his back. The holes were made by a pencil or an ice pick and did not require stitches. A doctor closed the cut to Martinez's head with two staples.

On October 31, 2009, police showed Martinez a number of photographic lineups. He selected a photograph of defendant as one of the individuals who started the fight at the party. On cross-examination Martinez said he does not remember seeing

6

defendant before. Corona did not know if defendant was one of the males involved in the fight.

*Defendant's Statements to the Police*

Buena Park Police Officer Luis Garcia interrogated defendant three times over a three-day period at juvenile hall. Defendant admitted being at the party in Buena Park. He said he met up with "Brownie" at an earlier party that night and he went to the party in Buena Park with a girl and "Listo," a Barrio Pobre member. He admitted the confrontation between Barrio Pobre members and Blacks at the party. He said that as they were leaving, the Barrio Pobre members he was with said, "we're coming back." Springer said he was from Hawaiian Gardens and told defendant and his friends to leave. He heard someone say Springer had a gun. As they were leaving, defendant heard Listo say he was coming back to fight the Blacks. Defendant said he, Listo, and "Blackie" returned to the house to fight.

Defendant initially claimed to have left the party and gone home, but one of the interrogators told defendant he had been identified as standing next to the shooter when Springer got killed. Defendant denied having gone back to the party after he left. He later admitted returning to the party and "took off running" after the shooting. He claimed not to know who did the shooting. Later, he said "Blackie," whom he had just met, was the shooter. Defendant said he did not see Springer get shot, but he saw Blackie with the sawed-off shotgun and heard the shot. Prior to the firing the shot, Blackie had yelled, "Barrio Pobre doesn't f. . . around."

In the other interrogations, defendant identified a photograph of Listo and identified Bautista as Listo. Defendant said he did not expect Bautista to return with a shotgun and shoot. Defendant also said Blackie was actually Brownie and identified codefendant Vilchis as Brownie.

7

*Stipulation*

The parties stipulated Barrio Pobre is a criminal street gang, defendant was an active participant in Barrio Pobre on September 11, and 13, 2009, and he knew members of the gang engaged in a pattern of criminal activity.

*Gang Expert Testimony*

Anaheim Police Department Investigator Richard Browning testified as a gang expert. Browning opined Vilchis and Bautista were active participants in Barrio Pobre in September 2009. He agreed Barrio Pobre is a criminal street gang.

Browning stated Springer's homicide benefitted the gang because the key to Hispanic gang culture is violence and the more violent the individual, the more respect the individual garners from his own gang and from rival gangs. Retaliation from a rival gang may not occur if the individual is well-respected (feared) by the rival gang. Additionally, such a violent act translates into control in the neighborhood because intimidated individuals will not call the police. He added the more violent the act, the more the act benefits the gang.

Browning said the Jack in the box incident was predictable because Martinez did not back down from the mad dogging (staring) by defendant and those he was with. According to Browning, Martinez's act of walking away from defendant and the others outside the Jack in the box was considered an act of disrespect by defendant and his group. Browning said it is not uncommon for a gang member who expects to get caught for one crime may attempt to commit other violent acts so their gang will enjoy a reputation as "the biggest, baddest gang around" and they will be considered "the biggest, baddest person in the gang."

*Defense Evidence*

Defendant testified in his own defense. He said he was 17 years old in September 2009. He admitted associating with Barrio Pobre and said he had been jumped into the gang.

Defendant also admitted being present at the Jack in the box incident with Bautista and a few females. That day, Bautista saw Martinez and told defendant he (Bautista) had gotten kicked out of school because he had been involved in a fight with Martinez at school. Defendant said he and Bautista mad dogged Martinez from outside the restaurant. When Martinez left the restaurant, he and Bautista went behind a dumpster to fight. Martinez threw the first punch, striking Bautista. Defendant stepped in because at one point Bautista looked dazed and Martinez had the upper hand. Defendant admitted punching Martinez and denied kicking him. Defendant also denied having any intent to kill.

On the day Springer was killed, defendant had been at a park with Bautista. They smoked marijuana and defendant acquired a bottle of gin at the first party he went to that night. He met Gutierrez and a girl named Myra at the first party.

Defendant drove to the party in Buena Park. He was feeling "a little buzzed" and felt the effects of the gin. He said he was struck twice by Blacks at the party and then bottles were thrown in his direction. Defendant admitted throwing one or two bottles himself.

Defendant left the party after the brouhaha with the Black guests. He never heard anyone threaten Springer as he (defendant) was leaving. When he left the party, defendant drove to a location where he had a shotgun.[2] He got the shotgun to scare people because he felt outnumbered, but he only intended to scare the Black gang members with it. Defendant was carrying the shotgun as he approached the house where

---

[2] On cross-examination, defendant said the shotgun was in his car and he did not drive away from the party to find the shotgun.

9

the party was taking place and he saw Gutierrez. She told him, "don't shoot him." He did not know who she was talking about, but as he did not intend to shoot anyone, he did not pay attention to her. He later saw Springer. Springer yelled at defendant, pulled out his gun, and pointed it at him. Defendant fired the shotgun because he was afraid. He said Bautista and Vilchis were not present when he shot Springer. Defendant subsequently disposed of the shotgun that had belonged to the gang.

Defendant said he lied to the police, but testified truthfully. He said Vilchis was not at the party in Buena Park and he lied to police when he told them Vilchis went with him to retrieve the shotgun and that Vilchis shot Springer. He told police he drove away from the party, met up with Bautista and Blackie (Vilchis), and 15 minutes later when Bautista and defendant returned to the party holding the shotgun, Vilchis then racked it. He said it was not true that he walked up to the party with Bautista and Vilchis. Defendant told police he saw Vilchis fire the shotgun twice and that before the shooting he heard someone yell, "Barrio Pobre doesn't f. . . around." Defendant also told police he heard Vilchis say, "I don't give a f. . . ."

Springer's wife, Arriola, testified she saw someone approach her husband holding a gun. Springer also had a gun. It was in the front waistband of his pants. Arriola told police she saw Springer pointing his gun and fire a couple of shots. She said she saw one of the suspects holding the gun in both hands and point it at Springer, but she did not see anyone shoot Springer.

*The Verdict and Sentencing*

As to the September 13, 2009 charges, the jury found defendant guilty of murder, conspiracy, and active participation in a criminal street gang. It found the special circumstance and firearm use allegations true in connection with the murder and found the murder and conspiracy were committed for the benefit of a criminal street gang. As

10

to the September 11, 2009 charges, the jury acquitted defendant of the attempted murder, but found him guilty of active participation in a criminal street gang.

Defendant hired new counsel after trial and the court relieved trial counsel of further representation. After Vilchis was tried, new counsel brought a motion for a new trial. The motion alleged newly discovered evidence as the result of Vilchis's trial. The motion alleged Arriola told the prosecutor she was sure Vilchis was the person who shot and killed her husband. The motion did not mention Bautista's testimony in Vilchis's trial. The court denied defendant's motion for a new trial and proceeded to sentence defendant.

The court exercised its discretion under section 190.5, subdivision (b) and elected not to impose a LWOP sentence on the murder conviction due to defendant's youth. Instead, the court imposed a total sentence of 50 years to life, consisting of 25 years to life on the murder conviction and a consecutive 25 years to life term for the firearm use. Sentences on the remaining enhancements and charges were either ordered to run concurrently or were stayed pursuant to section 654.

II

DISCUSSION

A. *Sufficiency of Evidence*

The rules applicable to a sufficiency of the evidence challenge are well established. "'In assessing the sufficiency of the evidence, we review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.]" (*People v. Steele* (2002) 27 Cal.4th 1230, 1249.) We must accept all assessments of credibility made by the trier of fact and determine if substantial evidence exists to support each element of the offense. (See *People v. Carpenter* (1997) 15 Cal.4th 312, 387.) We presume in support of the judgment the existence of every fact that could reasonably be deduced from the evidence.

11

(*People v. Kraft* (2000) 23 Cal.4th 978, 1053.)  We may reverse for lack of substantial evidence only if "'upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].'  [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)  In other words, the fact that the evidence could "'reasonably be reconciled'" with innocence does not permit an appellate court to reverse a conviction.  (*People v. Whisenhunt* (2008) 44 Cal.4th 174, 200.)

Defendant was charged in count four with the attempted murder of Martinez outside the Jack in the box.  Count five charged defendant with actively participating in a criminal street gang on the same day.  Defendant claims the evidence does not support his conviction in count five for active participation in a criminal street gang because the crime requires him to have committed an underlying felony offense and he was acquitted of the alleged underlying offense, attempted murder.

Section 186.22, subdivision (a) makes it a felony for one to actively participate in a "criminal street gang with knowledge that its members engage in or have engaged in a pattern of criminal gang activity, and who willfully promotes, furthers, or assists in any felonious criminal conduct by members of that gang . . . ."  This provision does not punish mere membership in a criminal street gang.  The elements of the offense are:  "(1) active participation in a criminal street gang, in the sense of participation that is more than nominal or passive; (2) knowledge that the gang's members engage in or have engaged in a pattern of criminal gang activity; and (3) the willful promotion, furtherance, or assistance in any felonious criminal conduct by members of that gang.  [Citation.]" (*People v. Albillar* (2010) 51 Cal.4th 47, 56.)  The issue here, given defendant was acquitted of the only felony he was charged with committing on the same date he allegedly actively participated in a criminal street gang on September 11, 2009, attempted murder as well as the lesser included offense of attempted voluntary manslaughter (§§ 664, subd. (a), 192, subd. (a)), is whether there is substantial evidence to support the third element of the substantive gang charge.

12

The fact that defendant was acquitted of attempted murder and attempted manslaughter for his conduct on September 11, 2009, does not mean the evidence fails to support the conviction for actively participating in a criminal street gang in this case. The law permits inconsistent verdicts. As Justice Chin, then on the First District Court of Appeal, stated for the court in *People v. Pahl* (1991) 226 Cal.App.3d 1651: "The question of the validity of inconsistent verdicts usually arises when a jury renders two verdicts on two different counts which are contradictory. [Citations.] Understandably, in such cases defendants, like appellant here, take the position that the acquittal is the legally correct verdict while the conviction is not. This argument has been universally rejected because inconsistent verdicts are probably the result of compromise in the jury room or of an extension of leniency or mercy to the defendant. [Citation.] In other words, if the conviction is supported by substantial evidence, it is valid because the defendant 'had the benefit of the jury's compassion, rather than suffering a burden because of its passion . . . .' [Citations.] [¶] Prior to 1927, appellate courts of this state did not follow this view, but held that inconsistent verdicts 'would not support a judgment of conviction.' [Citations.] In apparent response to these decisions, the Legislature amended section 954 in 1927, adding the last sentence of the section, which now provides: 'An acquittal of one or more counts shall not be deemed an acquittal of any other count.' [Citations.] This amendment made clear that each count must stand on its own, and a verdict on one has no bearing on any other. Therefore, the fact that a guilty verdict on one count is inconsistent with an acquittal verdict on another no longer compels reversal if there is substantial evidence to support the conviction. [Citation.]" (*Id*. at pp. 1656-1657.)

Defendant does not contend there would not have been sufficient evidence to support an attempted murder or attempted manslaughter conviction had the jury voted to convict defendant of one of those offenses. Rather, he simply argues the evidence was insufficient to support defendant's conviction for actively participating in a criminal

13

street gang because he was acquitted of the underlying felony offense. However, as it is not improper for the jury to register inconsistent votes, the issue is whether evidence admitted at trial supports the conviction, notwithstanding defendant's acquittal on the attempted murder charge. There is. Martinez testified he was mad dogged by gang members. Defendant admitted he was one of those who stared at Martinez. When Martinez fought Bautista, defendant joined in the fight because Martinez was getting the best of defendant's fellow gang member. The females who were also dressed at gang members joined in the beating of Martinez. As a result of the fracas, Martinez had to have his scalp stapled closed and he received two puncture wounds to his back. The puncture wounds were made by a pencil or an ice pick. This evidence of felonious conduct by defendant and at least one fellow gang member supports the third element of the substantive gang crime. The stipulation submitted by the parties established the first two elements of the gang crime. Thus, the evidence supports defendant's conviction in count four for actively participating in a criminal street gang.

B. *Response to Jury Question*

Related to the above issue is defendant's second contention. During deliberations, the jury asked the court whether it could convict defendant on count five (actively participating in a criminal street gang) if it acquitted him on count four (attempted murder). The trial court informed the jury it could. Defendant contends the court's answer was wrong. As we have found the evidence supports defendant's conviction for actively participating in a criminal street gang as charged in count five, notwithstanding his acquittal of attempted murder in count four, the court's answer to the jury's question was not incorrect—it could convict defendant of actively participating in a criminal street gang if it acquitted him of attempted murder.

Moreover, defendant forfeited this issue on appeal by failing to object to the court's proposed answer. The procedure to be used in answering any jury questions

14

was agreed to by the parties and adopted by the court:  The court would review any jury question and formulate an appropriate response.  The clerk would then call the attorneys with the question and the proposed response.  Counsel were notified of the question and proposed answer in this instance and did not object to the proposed response.  "'Generally, a party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language.' [Citation.]"  (*People v. Guiuan* (1998) 18 Cal.4th 558, 570.)

C.  *Modified CALCRIM No. 1400*

As noted above, the information charged defendant with two counts of actively participating in a criminal street gang (§ 186.22, subd. (a)).  The date of violation in count three was September 13, 2009, and the date of violation in count five was September 11, 2009.  As mentioned above, section 186.22, subdivision (a) requires the defendant to have willfully promoted, furthered or assisted in felonious criminal conduct by members of the gang.  (*People v. Albillar*, *supra*, 51 Cal.4th at p. 56.)

The court instructed the jury pursuant to a modified version of CALCRIM No. 1400, the standard instruction setting forth the elements of a violation of section 186.22, subdivision (a).  Defendant argues the instruction, insofar as it relates to count five, denied him due process and his right to present a defense, in violation of the Fifth, Sixth, and Fourteenth Amendments.  The purported flaw in the modified instruction is that it permitted the jury to find defendant guilty of actively participating in a criminal street gang on September 11, 2009, based on crimes that were *not* committed by defendant or another gang member on September 11, 2009.  The Attorney General urges us to find defendant forfeited the instructional error claim by failing to object to the instruction.  Defendant responds that CALCRIM No. 1400, as modified, was not a

15

correct statement of the law and no objection was required to preserve the issue for appeal.

An objection in the trial court is not required where an instruction is incorrect in law. (*People v. Smithey* (1999) 20 Cal.4th 936, 976-977, fn. 7; § 1259 ["appellate court may . . . review any instruction given, refused or modified, even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby."].) Because the instruction affected the substantial rights of defendant, we address the issue despite his failure to object.

The instruction informed the jury: "Felonious criminal conduct means committing or attempting to commit any of the following crimes: murder, voluntary manslaughter, involuntary manslaughter, conspiracy to commit assault with force likely to produce great bodily injury, attempted murder, [or] attempted voluntary manslaughter." Defendant contends the court improperly conflated counts three and five in the instruction by including all the crimes charged on September 11 and 13, 2009. He argues the result was the jury was given eight possible crimes that could qualify as the felonious criminal conduct required in count five while only two of the listed crimes could possibly apply—attempted murder and attempted voluntary manslaughter—and the jury acquitted him of both. He reasons that because the jury was instructed that *any* of the eight specifically listed offenses could serve as the requisite felonious criminal conduct required and the jury found him guilty of murder and conspiracy based on the shooting at the party in Buena Park two days *after* the date of violation in count five, the instruction permitted the jury to find him guilty of actively participating in a criminal street gang on September 11, 2009 (count five) based on acts that occurred on September 13, 2009, and which also served as the felonious criminal conduct required by the charge of actively participating in a criminal street gang as charged in count three.

Instructing the jury that defendant is charged with actively participating in a criminal street gang on two separate days and listing the felonies the jury may select from

16

to support a finding of guilt on each count is not in itself improper. For example, if a defendant is charged with committing murders on two separate dates and with actively participating in a criminal street gang on the same dates, it would not be improper to instruct the jury pursuant to CALCRIM No. 1400 that the felonious conduct underlying each charge of actively participating in a criminal street gang is the murder allegedly committed on the same date as the charged gang offense. A problem, however, arises when the court sets forth a list of possible underlying felonies that do not apply to both counts of actively participating in a criminal street gang and the court does not specify which felonious conduct applies to which count. The present case proves the point.

Aside from the gang crime charged in count five, the only other felony alleged to have occurred on that date, September 11, 2009, was attempted murder. The jury acquitted defendant of the attempted murder and the lesser included offense of attempted voluntary manslaughter. However, the instruction listed a number of other offenses that could serve as the requisite underlying felonious conduct. The problem is (1) a number of those offenses were alleged to have occurred on September 13, 2009, *not* September 11, 2009, and (2) the instruction failed to inform the jury it could not use felonious conduct committed on September 13, 2009, the date of violation alleged in count three, to support a finding of guilt on count five. For example, murder could not serve as the felonious conduct necessary to support the September 11, 2009 charge of actively participating in a criminal street gang because there was no murder on that date.

We are aware there are times when the evidence does not strictly conform to the date of violation alleged in the information and the variance is not fatal to a resulting conviction. (*People v. Lees* (1967) 257 Cal.App.2d 363, 369.) This situation presents a distinction with a difference. There were two separate charges alleging violation of section 186.22, subdivision (a)—one on September 11, and one on September 13, 2009. Evidence of the commission of a felony on but one of the dates will

17

not support two convictions for actively participating in a criminal street gang on separate days.

The modified instruction given the jury in this matter lessened the prosecution's burden of proof. When we consider the fact the instruction permitted the jury to convict defendant on count five based on a felony committed on a different date—a date defendant was alleged in count three to have actively participated in a criminal street gang—and the fact the jury not only acquitted defendant of the only felony alleged to have occurred on the same date as the violation of section 186.22, subdivision (a) alleged in count five, it also acquitted him of the lesser included offense, we conclude the error was prejudicial regardless of the standard prejudice. (*Chapman v. California* (1967) 386 U.S. 18, 24 [error of federal constitutional dimension requires reversal unless show harmless beyond a reasonable doubt]; *People v. Watson* (1956) 46 Cal.2d 818, 836 [reasonably probable error prejudiced defendant].) We therefore reverse defendant's conviction on count five.

D. *Ineffective Assistance of Counsel & the Stipulation*

Defendant next argues trial counsel was ineffective for entering into a stipulation concerning the two counts of actively participating in a criminal street gang. Initially, counsel stipulated Barrio Pobre qualified as a criminal street gang within the meaning of section 186.22, subdivision (f), defendant was an active participant and member of Barrio Pobre on September 11 and 13, 2009, and the stipulation was "intended to provide conclusive proof of all elements required by Penal Code section 186.22(a)." The stipulation was later changed to delete the quoted language. He asserts that although the stipulation was subsequently modified to delete the quoted, offensive language, the jury could have convicted defendant on the basis of the superseded stipulation. Because we found defendant's conviction for actively participating in a criminal street gang in count five must be reversed due to instructional error (II, C, *ante*),

18

we do not address his ineffective assistance of counsel claim as it relates to that conviction. Addressing the merits of his claim as it relates to his conviction in count three for actively participating in a criminal street gang, we reject his argument.

A criminal defendant has a federal and state constitutional right to the effective assistance of counsel. (U.S. Const., 6th & 14th Amends; Cal. Const., art. I, § 15.)  There is no substantive difference between the federal and state constitutional right. (*People v. Doolin* (2009) 45 Cal.4th 390, 421.)  "The right to counsel is a fundamental right of criminal defendants; it assures the fairness, and thus the legitimacy, of our adversary process.  [Citation.]  The essence of an ineffective-assistance claim is that counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect. [Citations.]" (*Kimmelman v. Morrison* (1986) 477 U.S. 365, 374-375.)

"Defendant has the burden of proving ineffective assistance of counsel. [Citation.]  To prevail on a claim of ineffective assistance of counsel, a defendant '"must establish not only deficient performance, i.e., representation below an objective standard of reasonableness, but also resultant prejudice."'  [Citation.]  A court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.  [Citation.]  Tactical errors are generally not deemed reversible, and counsel's decisionmaking must be evaluated in the context of the available facts. [Citation.]  To the extent the record on appeal fails to disclose why counsel acted or failed to act in the manner challenged, we will affirm the judgment unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation.  [Citation.]  Moreover, prejudice must be affirmatively proved; the record must demonstrate 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.'  [Citation.]" (*People v. Maury* (2003) 30 Cal.4th 342, 389.)

19

As a general rule, appellate courts give "great deference" to trial counsel's difficult tactical decisions. (*People v. Weaver* (2001) 26 Cal.4th 876, 925.) The decision to enter into a stipulation is generally considered a tactical decision to be made by counsel. (*People v. McCoy* (1974) 40 Cal.App.3d 854, 859.)

Defendant's claim fails because he cannot establish prejudice even were we to assume counsel was deficient, which we do not. First, the stipulation defendant claims establishes his attorney ineffectiveness was replaced by a different stipulation that did not have the same effect. The replacement stipulation was not the functional equivalent of admitting all the elements of actively participating in a criminal street gang. Instead, defendant stipulated his gang qualifies as a criminal street gang, he was an active participant, and he knew his gang engaged in a pattern of criminal gang activity. Even with the stipulation, the prosecutor had to prove beyond a reasonable doubt defendant willfully promoted, furthered, or assisted in felonious criminal conduct by members of the gang. (See *People v. Albillar*, *supra*, 51 Cal.4th at p. 56.)

Second, defense counsel may very well have entered into the stipulation in order to reduce the amount of gang evidence that would have been introduced absent the stipulation. While it may be safe to say any stipulation will reduce the amount of evidence admitted by the prosecution, it must be remembered that gang evidence carries a particular risk of prejudice in the jury's mind. (See *People v. Olguin* (1994) 31 Cal.App.4th 1355, 1369 [gang evidence "often carries with it a certain amount of prejudice"].) The stipulation kept the jury from hearing of a number of crimes committed by members of Barrio Pobre, evidence the jury would otherwise have heard. (§ 186.22, subd. (f) [to establish a gang qualifies as a criminal street gang, there must be proof members of the gang have engaged in a pattern of criminal gang activity]; *People v. Tran* (2011) 51 Cal.4th 1040, 1044 [the defendant's prior offenses may be used to establish requisite pattern of criminal gang activity].)

20

We reject defendant's claim of ineffective assistance of counsel. The stipulation ultimately submitted to the jury was not the one he complains about, was not the equivalent of an admission of guilt, and it appears counsel had a valid tactical reason for entering into the stipulation.

E. *People v. Chiu*

The prosecutor offered the jury three different theories upon which it could find defendant guilty of first degree murder: (1) defendant was the shooter; (2) if he was not the shooter, he aided and abetted the shooter and shared the shooter's intent, including deliberation and premeditation; or (3) if he was not the shooter and did not share the shooter's deliberation and premeditation, he was still liable for first degree murder based on the natural and probable consequences doctrine. In *People v. Chiu*, *supra*, 59 Cal.4th 155, the California Supreme Court held a defendant cannot be convicted of a first degree deliberate and premeditated murder based on the natural and probable consequences theory. (*Id*. at pp. 158-159.) When the prosecution has urged multiple theories of liability and the appellate court cannot find the jury rejected the unlawful theory, reversal is required. (*Id*. at p. 167.) Because we cannot conclude the jury did not convict defendant using the natural and probable consequences theory, we must reverse his first degree murder conviction and the attendant special circumstance. (See *People v. Salazar* (1987) 194 Cal.App.3d 634, 640, fn. 6 [enhancement has no life independent to the substantive offense to which it is attached].)

Although defendant testified at trial he was the person who shot Springer, albeit purportedly in self-defense, the prosecutor also introduced evidence defendant was *not* the shooter. The jury was instructed first degree murder liability could be found based on defendant's sharing the intent of the actual shooter or under the natural and probable consequences doctrine based on his conspiring to commit an assault with a firearm. After the jury found defendant guilty, the prosecution tried Vilchis for the

21

murder. In his trial as well, despite there having been *some* evidence Vilchis shot Springer, Vilchis's jury was told first degree murder liability could be based on the natural and probable consequences theory if it found another was the shooter.

The fact that defendant testified he was the shooter, contrary to his statements to the police, does not compel us to conclude the jury found him guilty of first degree murder because he was the shooter and rejected the evidence that Vilchis was the shooter, as well as the natural and probable consequences theory of liability. Indeed, after Vilchis and defendant had both been convicted of the first degree murder of Springer, the prosecutor stated in her sentencing brief that "[b]oth [defendant and Vilchis] were convicted of first degree murder as *vicarious shooters* . . . ." (Italics added.) It was because both had been convicted on an aiding and abetting theory (which may have been the natural and probable consequences doctrine) that the prosecutor claimed Arriola's testimony in Vilchis's trial that Vilchis was the person she saw with a gun, not defendant, was not material to the issue of defendant's guilt or innocence. Because the jury may have convicted defendant of first degree murder using the discredited natural and probable consequences theory of liability for a nonshooter, we have no alternative but to reverse his conviction for first degree murder.

F. *Other Issues*

The reversal of defendant's murder conviction (count one) renders moot defendant's claim that the trial court erred in denying his motion for a new trial based on Arriola and Bautista's testimony in Vilchis's trial concerning Vilchis's possession of a gun just prior to the shooting. Such testimony would not have affected defendant's conviction for conspiracy or active gang participation on September 13, 2009, the date of the killing. Defendant's ineffective assistance of counsel claim based on trial counsel's failure to produce Bautista's testimony and Arriola's testimony about seeing Vilchis with a gun is also rendered moot, as is his claim counsel did not present the newly discovered

22

testimony at the hearing on the motion for a new trial, his claim of cruel and unusual punishment based on his sentence of 50 years to life, and the impact of section 3051 on the lawfulness of his sentence.

## III

## DISPOSITION

Defendant's murder conviction on count one, the sentencing allegations attached to that conviction, and his conviction on count five (§186.22, subd. (a)) are reversed.  The judgment is otherwise affirmed and the matter is remanded to the superior court for retrial on counts one and five.


MOORE, ACTING P. J.

WE CONCUR:


IKOLA, J.


THOMPSON, J.