Filed 12/15/15  P. v. Cortez CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>WALTER MORALES CORTEZ et al.,<br><br>Defendants and Appellants. | D068051<br><br><br><br>(Super. Ct. No. RIF1103048) |

APPEAL from a judgment of the Superior Court of Riverside County, Michael J. Rushton, Judge.  Affirmed in part and reversed in part with directions.

Arthur Martin, under appointment by the Court of Appeal, for Defendant and Appellant Walter Morales Cortez.

Rodger P. Curnow, under appointment by the Court of Appeal, for Defendant and Appellant Lilia Teresa Rivas.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Charles C. Ragland and Brendon W. Marshall, Deputy Attorneys General, for Plaintiff and Respondent.

In *People v. Chiu* (2014) 59 Cal.4th 155 (*Chiu*), our Supreme Court determined that an aider and abettor may no longer be convicted of first degree murder on the theory the victim's death was the natural and probable consequence of the aider and abettor's participation in another crime committed by the actual killer; the court held that a natural and probable consequence theory will only support an aider and abettor's conviction of second degree murder.

Here, two defendants were tried for murder and attempted murder before the court's opinion in *Chiu* was rendered, and the trial court instructed the jury that one of the defendants could be convicted of first degree murder on a theory the victim's death was the natural and probable consequence of her participation as an aider and abettor. Under *Chiu*, the natural and probable consequence instruction the trial court gave was erroneous, and, in light of the prosecutor's reliance on that theory in her argument to the jury, we are not convinced beyond a reasonable doubt the error was harmless. Accordingly, the aider and abettor's first degree murder conviction must be reversed.

FACTUAL AND PROCEDURAL BACKGROUND

A. *Shooting*

Defendants and appellants Walter Morales Cortez and Lilia Teresa Rivas are married. Cortez was the founder of a "tagging crew" known as Brown Evil (BE); Rivas was an associate of BE. The Romoland Vatos Locos (RVL) is a Riverside County criminal street gang; RVL and BE compete as rivals over territory in Riverside.

On June 10, 2011, an escalating series of confrontations between BE members and RVL members ended when an RVL member, Adrian Acosta, walked up to the fenced yard of a home occupied by BE members. Adrian Acosta confronted Rivas and

2

challenged her to fight; she slapped him and a fist fight broke out between them. Raul Acosta, Adrian's older brother, attempted to intervene and break up the fight.

At that point, Rivas knew her husband was armed. Earlier in the day, she had repeatedly told other BE members that Cortez was "strapped" and that she and Cortez were ready to "take care of things." Rivas backed away from the fight and yelled to her husband, Cortez, who was nearby: "He hit me, shoot him, shoot him." Cortez pulled out a .38-caliber revolver; Raul Costa jumped in front of his younger brother and yelled: "Don't shoot my brother." Although the fight between Rivas and Adrian Acosta had stopped, and Rivas was standing next to Cortez inside the fence, Cortez fired four shots; three hit Adrian Acosta in the chest, and he died at the scene; one shot hit Raul Acosta, and he was able to flee from the scene.

The following day, Cortez burned the clothes he was wearing at the time of the shooting and threw the gun into the ocean. Cortez also tried to get another BE member to take responsibility for the shooting; for her part, Rivas prevailed upon a family member to write an alibi letter to police stating that Cortez and Rivas were not at the house at the time of the shooting.

B. *Trial Court Proceedings*

By way of an amended information, Cortez and Rivas were each charged with one count of first degree murder and one count of attempted first degree murder (Pen. Code,[1] §§ 187, subd. (a), 664, subd. (a)); in addition, the information alleged that Cortez personally and intentionally discharged a firearm causing great bodily injury or death (§ 12022.53, subd. (d)).

---

[1]     All further statutory references are to the Penal Code unless otherwise indicated.

3

Cortez and Rivas each testified on their own behalf. Cortez testified he shot in the direction of the Acosta brothers because he thought Rivas might have been stabbed and he thought he needed to defend her. Rivas testified she told Cortez to "pull it out" because she thought that the fight would end if Cortez brandished the gun; she denied telling Cortez to shoot anyone.

The trial court gave the jury, among other instructions, versions of CALCRIM Nos. 301 and 403. As given by the trial court, CALCRIM No. 301 required that Cortez's and Rivas's testimony be corroborated if they were accomplices. The version of CALCRIM No. 403 provided to the jury permitted the jury to find Rivas guilty of murder and attempted murder if Adrian Acosta's murder and the attempted murder of Raul Acosta were the natural and probable consequences of Cortez's commission of the crimes of brandishing a firearm or assault with a firearm, and Rivas knew that Cortez was going to commit those crimes and aided, facilitated, promoted, encouraged or instigated Cortez's commission of those crimes.

In her closing argument, the prosecutor told the jury that, under the natural and probable consequences doctrine, Rivas could be found guilty of both first degree murder and attempted first degree murder.

The jury found both Cortez and Rivas guilty of first degree murder. The jury also found both guilty of the attempted murder of Raul Acosta and, in a separate finding, that the attempt was an attempt to commit first degree murder; the jury also found Cortez had personally and intentionally discharged a firearm, causing great bodily injury. The trial court sentenced Cortez to 82 years to life in prison and Rivas to 32 years to life in prison. Both defendants filed notices of appeal.

4

DISCUSSION

I

Common Issues

A. *Corroboration*

The version of CALCRIM No. 301, which the trial court gave the jury, stated: "Except for the testimony of Walter Morales Cortez and Lilia Teresa Rivas[, which] require[s supporting] evidence[, i]f you decide that he or she is an accomplice[,] the testimony of only one witness can prove any fact." The trial court also gave the jury a version of CALCRIM No. 334, which stated: "Before you may consider the statement or testimony of Lilia Teresa Rivas as evidence against Walter Morales Cortez, and conversely, before you may consider the statement or testimony of Walter Morales Cortez against Lilia Teresa Rivas, you must decide whether Walter Morales Cortez and Lilia Teresa Rivas were accomplices. A person is an accomplice if he or she is subject to prosecution for the identical crime charged against the defendant. Someone is subject to prosecution if:

"1. He or she personally committed the crime;

"OR

"2. He or she knew of the criminal purpose of the person who committed the crime[.] [¶] . . . [¶]

"If you decide that a declarant or witness was not an accomplice, then supporting evidence is not required and you should evaluate his or her statement or testimony as you would that of any other witness.

5

"If you decide that a declarant or witness was an accomplice, then you may not convict the defendant of the crimes charged in counts 1 and 2, the lesser included offenses to those crimes or the gun use enhancements, based on the accomplice's statement or testimony alone. You may use the statement or testimony of an accomplice to convict the defendant only if:

"1. The accomplice's statement or testimony is supported by other evidence that you believe;

"2. That supporting evidence is independent of the accomplice's statement or testimony;

"AND

"3. That supporting evidence tends to connect the defendant to the commission of the crimes."

With respect to the defenses of self-defense and the defense of others, and defendants' alternative contention the shooting occurred in the heat of passion, the jury was instructed that the burden was on the prosecution to show beyond a reasonable doubt that those circumstances did not occur.

On appeal, Cortez and Rivas contend that CALCRIM No. 301, as given by the trial court, unduly interfered with their respective defenses of self-defense and the defense of others, as well as their claim that they acted in the heat of passion, because those matters depended in some measure on the respective testimony each provided on the other's behalf. They argue the instruction suggested to the jury that their own testimony was not sufficient to establish their defenses or mitigate their crimes to manslaughter. We find no prejudicial error.

6

As the Attorney General points out, in reviewing claims of instructional error, we "must consider whether it is reasonably likely that the trial court's instructions caused the jury to misapply the law. [Citation.] '[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction.' [Citations.]" (*People v. Carrington* (2009) 47 Cal.4th 145, 192.) Importantly, we must presume jurors are intelligent and "capable of understanding and correlating jury instructions." (*People v. Martin* (1983) 150 Cal.App.3d 148, 158.)

The CALCRIM No. 334 instruction, which defined the term accomplice and explained that accomplice statements could not be used *against* either defendant without corroboration, substantially diminished any risk jurors would misinterpret CALCRIM No. 301 when they considered Rivas's and Cortez's contentions that at the time of the shootings they were afraid Rivas might be killed or seriously injured. Indeed, CALCRIM No. 334 largely provides the amplification, which defendants suggest CALCRIM No. 301 needed to make it accurate. Thus, we are not inclined to find that where, as here, there was no request for an amplification of CALCRIM No. 301, the trial court erred in giving its version of CALCRIM No. 301 along with CALCRIM No. 334. Taken together, the instructions were more likely to be interpreted as requiring caution when considering *incriminating* inferences to be drawn from the other defendant's statements.

Moreover, any instructional error in failing to more fully amplify CALCRIM No. 301 was not prejudicial. In determining the impact of such an instructional error, if it occurred, we are governed by the familiar standard set forth in *People v. Watson* (1956) 46 Cal.2d.818, 836. (See *People v. Breverman* (1998) 19 Cal.4th 142, 149.) Here, the

7

only harm the challenged instruction may have caused was in damaging defendants' credibility. However, Cortez's and Rivas's credibility was substantially undermined by their respective efforts to manufacture an alibi and induce someone else to take responsibility for the shootings, and the testimony of witnesses to the shooting who stated that the fight was over by the time Cortez started firing at the Acosta brothers. Given defendants' lack of credibility and other evidence of their guilt, there is little, if any, probability a more fully amplified version of CALCRIM No. 301 would have resulted in a more favorable verdict for either defendant.

B. *Sufficiency of the Evidence*

Next, the defendants contend the prosecution failed to show beyond a reasonable doubt that, when he shot the Acosta brothers, Cortez was not acting either to defend Rivas or in the heat of passion. Again, we reject defendants' contention.

" ' "When the sufficiency of the evidence is challenged on appeal, the court must review the whole record in the light most favorable to the judgment to determine whether it contains substantial evidence--i.e., evidence that is credible and of solid value--from which a rational trier of fact could have found the defendant guilty beyond a reasonable doubt." ' " (*People v. Hill* (1998) 17 Cal.4th 800, 848-849, quoting *People v. Jennings* (1991) 53 Cal.3d 334, 364.) The defendant bears the burden of demonstrating the insufficiency of evidence and must present the facts in the light most favorable to the prosecution. (*People v. Sanghera* (2006) 139 Cal.App.4th 1567, 1574.) Thus, the appellate court "must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Jones* (1990) 51 Cal.3d 294, 314, citing *People v. Johnson* (1980) 26 Cal.3d 557, 576-577.)

8

As we have noted, here witnesses testified that earlier in the day, after an initial confrontation with RVL members, Rivas told other BE members that Cortez was "strapped"; significantly, witnesses testified the fight with Adrian Acosta was over when Cortez began shooting and that, at that point, Rivas was standing next to Cortez. After the shooting, both defendants made fairly substantial efforts to conceal their participation in the crime: Cortez attempted to get an acquaintance to take responsibility for the attack, and Rivas asked a relative to establish an alibi for both of them. In addition, Cortez burned the clothing he was wearing at the time of the killing and threw the gun he used into the ocean. Plainly, this conduct was not consistent with a belief Cortez was acting in lawful defense of Rivas but was far more consistent with criminals who were conscious of their guilt of a very serious crime. Taken together, the testimony of witnesses who saw the shooting and defendants' manifest consciousness of guilt was more than sufficient to prove that the shootings were neither in the defense of Rivas nor in the heat of passion, but were a cold-blooded attack on rival gang members.

II

Rivas's Separate Contentions

A. *Natural and Probable Consequence Doctrine*

Rivas also contends that in light of *Chiu*, her convictions for first degree murder and attempted first degree murder must be reversed and remanded with instructions that convictions for second degree murder and attempted second degree murder be entered and that she be resentenced. We agree in part.

9

1. <u>People v. Chiu</u>

In *Chiu*, a jury convicted the defendant of first degree willful, deliberate, and premeditated murder, after the jury was instructed the defendant was guilty of that offense if he aided and abetted in either of two target offenses—assault and disturbing the peace—and murder was the natural and probable consequence of those target offenses. The defendant in *Chiu* had participated in a brawl between two groups of high school students; during the course of the brawl, he told one of his friends to "grab the gun," and, when the friend appeared with the gun but hesitated to shoot, the defendant and a third participant yelled, "shoot him, shoot him." The defendant's friend then shot and killed a member of the rival group.

In reversing the defendant's first degree murder conviction, the Supreme Court discussed the development of the natural and probable consequences theory of culpability and its role in the crime of murder: "The natural and probable consequences doctrine is based on the principle that liability extends to reach 'the actual, rather than the planned or "intended" crime, committed on the policy [that] . . . aiders and abettors should be responsible for the criminal harms they have naturally, probably, and foreseeably put in motion.' [Citations.] We have never held that the application of the natural and probable consequences doctrine depends on the foreseeability of every element of the nontarget offense. Rather, in the context of murder under the natural and probable consequences doctrine, cases have focused on the reasonable foreseeability of the actual resulting harm or the criminal act that caused that harm. [Citations.]

"In the context of murder, the natural and probable consequences doctrine serves the legitimate public policy concern of deterring aiders and abettors from aiding or

10

encouraging the commission of offenses that would naturally, probably, and foreseeably result in an unlawful killing. A primary rationale for punishing such aiders and abettors—to deter them from aiding or encouraging the commission of offenses—is served by holding them culpable for the perpetrator's commission of the nontarget offense of second degree murder. [Citation.] It is also consistent with reasonable concepts of culpability. Aider and abettor liability under the natural and probable consequences doctrine does not require assistance with or actual knowledge and intent relating to the nontarget offense, nor subjective forseeability of either that offense or the perpetrator's state of mind in committing it. [Citation.] It only requires that under all of the circumstances presented, a reasonable person in the defendant's position would have or should have known that the nontarget offense was a reasonably foreseeable consequence of the act aided and abetted by the defendant. (*Ibid*.)" (*Chiu*, *supra*, 59 Cal.4th at pp. 164-166, italics and fn. omitted.)

However, because the additional elements required for commission of first degree murder—willfulness, premeditation and deliberation—are not directly related to the deterrence of harm, which serves as the basis for the natural and probable consequences theory, and because of the severe penalty for first degree murder—25 years to life, with no possibility of parole until the defendant has served 25 years in prison (§§ 190, subd. (a), 3046, subd. (a)(2))—the court found the natural and probable consequences doctrine will not support a jury's determination that an aider and abettor acted with the requisite willfulness, premeditation and deliberation. "First degree murder, like second degree murder, is the unlawful killing of a human being with malice aforethought, but has the additional elements of willfulness, premeditation, and deliberation, which trigger a

11

heightened penalty. [Citation.] That mental state is uniquely subjective and personal. It requires more than a showing of intent to kill; the killer must act deliberately, carefully weighing the considerations for and against a choice to kill before he or she completes the acts that caused the death. [Citations.] Additionally, whether a direct perpetrator commits a nontarget offense of murder with or without premeditation and deliberation has no effect on the resultant harm. The victim has been killed regardless of the perpetrator's premeditative mental state. Although we have stated that an aider and abettor's 'punishment need not be finely calibrated to the criminal's mens rea' [citation], the connection between the defendant's culpability and the perpetrator's premeditative state is too attenuated to impose aider and abettor liability for first degree murder under the natural and probable consequences doctrine, especially in light of the severe penalty involved and the above-stated public policy concern of deterrence.

"Accordingly, we hold that punishment for second degree murder is commensurate with a defendant's culpability for aiding and abetting a target crime that would naturally, probably, and foreseeably result in a murder under the natural and probable consequences doctrine. We further hold that where the direct perpetrator is guilty of first degree premeditated murder, the legitimate public policy considerations of deterrence and culpability would not be served by allowing a defendant to be convicted of that greater offense under the natural and probable consequences doctrine." (*Chiu*, *supra*, 59 Cal.4th at p. 166.)

Importantly, the court in *Chiu* made it clear that an aider and abettor may be found guilty of first degree murder under a theory of direct participation: "Aiders and abettors may still be convicted of first degree premeditated murder based on direct aiding and

12

abetting principles.  [Citation.]  Under those principles, the prosecution must show that the defendant aided or encouraged the commission of the murder with knowledge of the unlawful purpose of the perpetrator and with the intent or purpose of committing, encouraging, or facilitating its commission.  [Citation.]  Because the mental state component—consisting of intent and knowledge—extends to the entire crime, it preserves the distinction between assisting the predicate crime of second degree murder and assisting the greater offense of first degree premeditated murder.  [Citations.] An aider and abettor who knowingly and intentionally assists a confederate to kill someone could be found to have acted willfully, deliberately, and with premeditation, having formed his own culpable intent.  Such an aider and abettor, then, acts with the mens rea required for first degree murder."  (*Chiu*, *supra*, 59 Cal.4th at pp. 166-167.)

The court found that the trial court's error was prejudicial and that reversal of the defendant's conviction was therefore required.  (*Chiu*, *supra*, 59 Cal.4th at p. 168.)  The court allowed the People to accept a reduction of the conviction to second degree murder or to retry the greater offense.  (*Ibid*.)

13

2. <u>Analysis–First Degree Murder</u>

Here, there is no dispute that under the instructions the trial court gave the jury, the jury could find Rivas guilty of first degree murder under the probable consequences doctrine. Indeed, the prosecutor relied on the probable consequences doctrine in her closing argument to the jury. The trial court's instructions also permitted Rivas to be convicted on the theory that she was a direct participant in the murder of Adrian Acosta. However, as the Attorney General concedes, in her rebuttal argument the prosecutor directed the jury to focus primarily on the natural and probable consequences doctrine.

When, as here, "a trial court instructs a jury on two theories of guilt, one of which was legally correct and one legally incorrect, reversal is required unless there is a basis in the record to find that the verdict was based on a valid ground. [Citations.] Defendant's first degree murder conviction must be reversed unless we conclude beyond a reasonable doubt that the jury based its verdict on the legally valid theory that defendant directly aided and abetted the premeditated murder. [Citation.]" (*Chiu*, *supra*, 59 Cal.4th at p. 167.)

Here, the prosecutor's emphasis on the natural and probable consequences theory in her rebuttal makes it difficult to conclude with confidence that the jury relied instead on the theory that Rivas directly aided and abetted premeditated murder. Admittedly, Rivas's fight with Adrian Acosta, in which mutual blows were apparently struck, and her statement to Cortez, "shoot him, shoot him," give rise to an inference that, at that point, she wanted her husband to kill Adrian Acosta and had the requisite intent to support a first degree murder conviction as a direct aider and abettor. However, those

14

circumstances do not necessarily show that the jury found the required mental state, especially in light of the prosecutor's argument.

Contrary to the Attorney General's argument, the jury's finding that the attempted murder of Raul Acosta was an attempted first degree murder, does not show the jury found that Rivas directly aided and abetted either the murder of Adrian Acosta or the attempted murder of Raul Acosta. The instructions that the trial court gave the jury permitted the jury to use the natural and probable consequences theory to find Rivas committed an attempted first degree murder as well as first degree murder. In particular, the instructions permitted the jury to find Rivas committed attempted first degree murder if *either* Cortez or Rivas acted willfully, deliberately and with premeditation.

### 3. Analysis–Attempted First Degree Murder

We are compelled by the court's holding in *People v. Favor* (2012) 54 Cal.4th 868, 877-878 (*Favor*) to affirm Rivas's conviction of the attempted murder of Raul Acosta and the jury's specific finding the attempt was an attempt to commit first degree murder.

The attempt to commit a crime is proscribed by section 664. Section 664, subdivision (a) sets forth the punishment for attempts to commit felonies, including attempts to commit murder. In part, section 664, subdivision (a) states: "[I]f the crime attempted is willful, deliberate, and premeditated murder, as defined in Section 189, the person guilty of that attempt shall be punished by imprisonment in the state prison for life with the possibility of parole. If the crime attempted is any other one in which the maximum sentence is life imprisonment or death, the person guilty of the attempt shall be punished by imprisonment in the state prison for five, seven, or nine years. The additional term provided in this section for attempted willful, deliberate, and

15

premeditated murder shall not be imposed unless the fact that the attempted murder was willful, deliberate, and premeditated is charged in the accusatory pleading and admitted or found to be true by the trier of fact."

In *Favor*, the court held that a jury *could* rely on the natural and probable consequences doctrine in finding an aider and abettor guilty of the crime of attempted murder and that a jury's separate determination that the crime attempted was first degree murder would apply to the aider and abettor, even if the aider and abettor did not act with willfulness, deliberation and premeditation: "Because section 664(a) 'requires only that the attempted murder itself was willful, deliberate, and premeditated' [citation], it is only necessary that the attempted murder 'be committed by one of the perpetrators with the requisite state of mind.' [Citation.] Moreover, the jury does not decide the truth of the penalty premeditation allegation until it first has reached a verdict on the substantive offense of attempted murder. [Citation.] Thus, with respect to the natural and probable consequences doctrine as applied to the premeditation allegation under section 664(a), attempted murder—not attempted premeditated murder—qualifies as the nontarget offense to which the jury must find foreseeability. Accordingly, once the jury finds that an aider and abettor, in general or under the natural and probable consequences doctrine, has committed an attempted murder, it separately determines whether the attempted murder was willful, deliberate, and premeditated.

"Under the natural and probable consequences doctrine, there is no requirement that an aider and abettor reasonably foresee an attempted premeditated murder as the natural and probable consequence of the target offense. It is sufficient that attempted murder is a reasonably foreseeable consequence of the crime aided and abetted, and the

16

attempted murder itself was committed willfully, deliberately and with premeditation." (*Favor*, *supra*, 54 Cal.4th at pp. 879-880, italics omitted.)

In *Chiu*, the court took some pains to distinguish *Favor*: "Relying on *Favor*, the People urge us to reach the same result here. However, we find that case distinguishable in several respects. Unlike *Favor*, the issue in the present case does not involve the determination of legislative intent as to whom a statute applies. Also, unlike *Favor*, which involved the determination of premeditation as a requirement for a statutory penalty provision, premeditation and deliberation as it relates to murder is an element of first degree murder. In reaching our result in *Favor*, we expressly distinguished the penalty provision at issue there from the substantive crime of first degree premeditated murder on the ground that the latter statute involved a different degree of the offense. (*Favor*, *supra*, 54 Cal.4th at pp. 876–877.) Finally, the consequence of imposing liability for the penalty provision in *Favor* is considerably less severe than in imposing liability for first degree murder under the natural and probable consequences doctrine. Section 664(a) provides that a defendant convicted of attempted murder is subject to a determinate term of five, seven, or nine years. If the jury finds the premeditation allegation true, the defendant is subject to a sentence of life with the possibility of parole. (*Ibid*.) With that life sentence, a defendant is eligible for parole after serving a term of at least seven years. (§ 3046, subd. (a)(1).) On the other hand, a defendant convicted of first degree murder must serve a sentence of 25 years to life. (§ 190, subd. (a).) He or she must serve a minimum term of 25 years before parole eligibility. (§ 3046, subd. (a)(2).) A defendant convicted of second degree murder must serve a sentence of 15

17

years to life, with a minimum term of 15 years before parole eligibility. (§§ 190, subd. (a), 3046, subd. (a)(2).)" (*Chiu*, *supra*, 59 Cal.4th at p. 163, italics omitted.)

In light of the holding in *Favor*, and the court's express unwillingness in *Chiu* to depart from it, we are in no position to question its validity. (See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) Thus, the trial court did not err in permitting the jury to rely on the natural and probable consequences theory in finding that Rivas attempted to murder Raul Acosta and that the attempt was willful, premeditated and deliberate.

B. *Aider and Abettor Instructions*

The trial court instructed the jury with CALCRIM Nos. 400 and 401, which set forth the general principles of aider and abettor culpability.[2] On appeal, Rivas argues

---

[2]     The version of CALCRIM No. 400 that the trial court provided stated:
"A person may be guilty of a crime in two ways. One, he or she may have directly committed the crime. I will call that person the perpetrator. Two, he or she may have aided and abetted a perpetrator, who directly committed the crime. A person is guilty of a crime whether he or she committed it personally or aided and abetted the perpetrator. "Under some specific circumstances, if the evidence establishes aiding and abetting of one crime, a person may also be found guilty of other crimes that occurred during the commission of the first crime."
The version of CALCRIM No. 401 which the trial court provided, stated:
"To prove that defendant Lilia Teresa Rivas is guilty of a crime based on aiding and abetting that crime, the People must prove that:
"1. The perpetrator committed the crime;
"2. The defendant Lilia Teresa Rivas knew that the perpetrator intended to commit the crime;
"3. Before or during the commission of the crime, the defendant Lilia Teresa Rivas intended to aid and abet the perpetrator in committing the crime;
"AND
"4. The defendant Lilia Teresa Rivas'[s] words or conduct did in fact aid and abet the perpetrator's commission of the crime.

18

that the trial court erred in failing to sua sponte instruct the jury that it could find that Rivas was guilty of a lesser crime than Cortez. We find no such duty.

1. Legal Principles

We agree with Rivas that an aider and abettor may be convicted of a lesser offense than the principal or perpetrator; importantly, however, an aider and abettor may also be convicted of a greater offense. (See *People v. McCoy* (2001) 25 Cal.4th 1111, 1117; *People v. Lopez* (2011) 198 Cal.App.4th 1106, 1118.) We have not found, and Rivas has not cited, any case in which a sua sponte duty to explain these principles has been imposed on trial courts, when as here the jury has been accurately instructed on the principles governing aider and abettor culpability. In the absence of such authority, we are governed by the general principal, that "[a] trial court has no sua sponte duty to revise or improve upon an accurate statement of law without a request from counsel [citation], and failure to request clarification of an otherwise correct instruction forfeits the claim of error for purposes of appeal. [Citations.]" (*People v. Lee* (2011) 51 Cal.4th 620, 638.)

We also reject Rivas's related claim that her counsel was ineffective in failing to ask for a pinpoint instruction on the possibility she may have committed lesser crimes than Cortez. In light of Rivas's role in fighting with Adrian and the legal possibility that Rivas might be found guilty of *greater* crimes than Cortez, counsel's failure to seek a pinpoint instruction on this issue may well have represented a tactical choice to focus on

---

"Someone *aids and abets* a crime if he or she knows of the perpetrator's unlawful purpose and he or she specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime.

"If all of these requirements are proved, the defendant does not need to actually have been present when the crime was committed to be guilty as an aider and abettor."

19

rebutting application of the natural and probable consequence doctrine and avoid any discussion of the possibility Rivas was guilty of greater crimes. Where such tactical possibilities appear on the face of the record, a claim of ineffective assistance of counsel will not prevail. (See *People v. Mai* (2013) 57 Cal.4th 986, 1009.)

C. *Juror Information*

1. Trial Court Proceedings

Following the jury's verdict, Rivas filed a petition under Code of Civil Procedure section 206, subdivision (g) in which she sought an order releasing the jurors' names, addresses, and telephone numbers. In support of the motion, she relied on statements Juror No. 7 made to her counsel after trial and in a written declaration. In her oral statement to counsel and in her written declaration, the juror stated that the jury believed that, having found Cortez guilty of first degree murder, and having found that Rivas was an aider or abettor, it had no choice other than to also find Rivas guilty of first degree murder. The trial court denied Rivas's petition.

2. Legal Principles

Code of Civil Procedure section 206, subdivision (g) permits a defendant to request the release of sealed juror information upon a showing of good cause within the meaning of Code of Civil Procedure section 237. (See *People v. Wilson* (1996) 43 Cal.App.4th 839, 852.) To show good cause, a defendant must make a showing that supports "a reasonable belief that jury misconduct occurred." (*People v. Jones* (1998) 17 Cal.4th 279, 317.) Importantly, under Evidence Code section 1150, subdivision (a), "evidence about a jury's 'subjective *collective* mental process purporting to show *how* the verdict was reached' is inadmissible . . . where . . . they 'at most suggest "deliberative

20

error" in the jury's collective mental process--confusion, misunderstanding, and misinterpretation of the law.' [Citations.]" (*Mesecher v. County of San Diego* (1992) 9 Cal.App.4th 1677, 1683.)

    3. <u>Analysis</u>

Here, Juror No. 7's statements were clearly inadmissible under Evidence Code 1150, subdivision (a) as they only reflected the jury's deliberative processes and would not support any finding of juror misconduct. In the absence of any evidence of misconduct, there was no good cause for the release of juror information; hence, the trial court did not abuse its discretion in denying Rivas's petition.

DISPOSITION

Rivas's conviction of first degree murder is reversed and remanded for further proceedings. As in *Chiu*, the People may accept a reduction of the conviction to second degree murder or retry the greater offense. In all other respects, the judgments of conviction are affirmed.

BENKE, Acting P. J.

WE CONCUR:

HUFFMAN, J.

NARES, J.

21