Filed 1/3/22  P. v. Ortiz CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>            v.<br><br>ARMANDO ORTIZ,<br><br>      Defendant and Appellant. | F082934<br><br>(Super. Ct. No. CF00650517)<br><br><br>**OPINION** |

## THE COURT[*]

APPEAL from an order of the Superior Court of Fresno County.  Arlan L. Harrell, Judge.

Allen G. Weinberg, under appointment by the Court of Appeal, Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, and Louis M. Vasquez, Deputy Attorney General, for Plaintiff and Respondent.

-ooOoo-

---

[*]      Before Hill, P. J., Levy, J. and Franson, J.

Defendant Armando Ortiz was convicted by jury trial of murder and robbery. Defendant filed a petition for resentencing, pursuant to Penal Code section 1170.95,[1] based upon the changes to the felony-murder rule and the natural and probable consequences doctrine of aider and abettor liability effectuated by Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437). The trial court denied defendant's petition, concluding that he was ineligible for relief because he was a major participant in the murder. On appeal, defendant contends the trial court's decision was error. We reverse the order and remand the matter for further proceedings pursuant to section 1170.95.

## PROCEDURAL SUMMARY

On April 13, 2000, the Fresno County District Attorney filed an information charging defendant and codefendant Shawn Walker with the first degree murder of Jose Rafael Navarro (§ 187, subd. (a); count 1) and second degree robbery (§ 211; count 2). As to defendant, the information further alleged that he personally and intentionally discharged a firearm causing great bodily injury or death in the commission of both offenses (§ 12022.53, subd. (d)), personally and intentionally discharged a firearm in the commission of both offenses (§ 12022.53, subd. (c)) and personally used a firearm as to both offenses (§§ 12022.5, subd. (a),[2] 12022.53, subd. (b)). As to defendant and Walker, the information alleged that a principal in the offense was armed with a firearm during the commission of both offenses (§ 12022, subd. (a)(1)).

On September 25, 2000, a jury found defendant guilty on counts 1 and 2. The jury further found true that a principal was personally armed with a firearm. However, the jury found not true the allegation that defendant personally used a firearm which caused great bodily injury.

---

[1] All further statutory references are to the Penal Code.

[2] The information alleged that defendant violated section 12022.5, subdivision (a)(1). That was likely a typographical error because subdivision (a)(1) does not exist. The enhancement alleged likely referred to section 12022.5, subdivision (a).

2.

This court affirmed defendant's conviction in a nonpublished opinion on January 8, 2003.[3]

On December 30, 2019, defendant filed a petition for resentencing pursuant to section 1170.95 and requested that counsel be appointed.

On May 19, 2021, the trial court denied defendant's petition with prejudice, concluding—based on the facts presented in our nonpublished opinion affirming his conviction—that defendant was a major participant in the murder, not merely an aider or abettor, and was therefore not entitled to relief under section 1170.95. The trial court did not appoint counsel for defendant or conduct an evidentiary hearing prior to making its determination.

On June 9, 2021, defendant filed a notice of appeal.

**FACTUAL SUMMARY**

"At approximately 1:30 a.m. on December 19, 1999, Josie Zapata, Laura Puentes and Javier Perdomo exited a taxicab near an apartment complex located in a high crime area of south Fresno. Just as they began walking toward the apartment they shared in the complex, Perdomo was hit on the head and knocked unconscious. Zapata heard Puentes scream and then she heard three gunshots. She turned around and saw four young, thin men dressed in black. One of the men was holding a long handgun. He looked Hispanic, in his 20s, and he had a thin moustache. He was about five feet four inches or five feet five inches tall. He was wearing an oversized, long, black jacket, black baggy pants and a black, close-fitting knit cap. She could not tell the race of the other three men. One of the four men hit Puentes on the head and she fell to the ground. Zapata started to run. The man holding the gun pursued her and hit her on the back of the head, knocking her unconscious. One of the four men took Perdomo's wallet and the cash he had in his pants pocket before they fled the scene.

---

[3] The People have requested that we take judicial notice of our prior unpublished opinion affirming both defendants' convictions. (*People v. Ortiz et al.* (Jan. 8, 2003, F037177) [nonpub. opn.].) The People's request is granted. We take judicial notice of our prior unpublished opinion in this matter pursuant to Evidence Code sections 452, subdivision (d), and 459, subdivision (a).

Perdomo's wallet contained his payroll check and a social security card belonging to Perdomo's brother, Victor.

"James Webb lived across the street. He was awakened by loud voices and the sound of gunshots. He looked out his bedroom window and saw one man run out from the apartment complex. A second man holding a gun came out of the complex and fired two shots at the first man who fell to the ground. The second man with the gun turned and went back into the apartment complex. Then he saw two Hispanic males run to another apartment complex south of his house. Webb's wife, Yolanda, saw a person dressed in black, heard three gunshots, and then saw two boys wearing dark clothing run into the apartment complex south of their house.

"Perdomo soon recovered consciousness. He saw a man, later identified as Jose Rafael Navarro, laying on the ground nearby. Navarro had suffered a gunshot wound to the abdomen. Perdomo tried to assist Navarro, but Navarro was unresponsive and he died a few minutes later.

"Officers arrived at approximately 1:45 a.m. An expended .44-caliber shell casing was found on the sidewalk in front of the crime scene and three more expended .44-caliber shell casings were found just north of the sidewalk area. Some shoe tracks found near the shell casings were photographed.

"A few minutes after 2:00 a.m., Kieng Youdoune was awakened by the sound of a gunshot. She lived one block east of the apartment complex where the robbery and homicide occurred. Youdoune discovered that the kitchen window of her home had been shattered by a gunshot. She found a .44-caliber bullet on the kitchen floor. She checked on her parents and then looked out the dining room window. She saw the defendants sitting on her front porch. She telephoned the police.

"Fresno Police Officer Anthony Bettencourt investigated the gunshot at the Youdoune residence. He noticed that there was a hole in the stucco on the upstairs wall of a two-story apartment building located on San Pablo Avenue directly north of the Youdoune residence. Officer Bettencourt was walking toward the entry of this apartment building at approximately 3:20 a.m. when he saw the defendants standing about 15 feet away from the bottom of the stairway leading to the two upstairs apartments of this building (apartments 201 and 202). Neither defendant was wearing a jacket, which was inappropriate for the cool weather (36 degrees Fahrenheit). Walker was wearing a black shirt and jeans; [defendant] was wearing a white T-shirt and jeans. Officer Bettencourt heard Walker say to [defendant], 'Let's get out of here. Too many cops tonight.' He detained

4.

the defendants and placed each of them alone in the rear seat of a patrol car. He walked upstairs to apartment 201 and knocked on the door. When no one answered, he forced entry. While checking for injured persons, he noticed a wallet and some identification documents in the bathroom. There was a bullet hole in the south wall of the kitchen that corresponded to the hole on the outside of the building. While Officer Bettencourt was inside the apartment, Walker kicked out the rear window of the patrol car.

"Genaro Garcia lived in apartment 202. Investigating Detective Michael Garcia testified that Genaro told him that defendants had lived in apartment 201 for at least a month. He had last seen defendants together drinking vodka during the evening of December 18 or the early morning hours of December 19. Youdoune testified that she occasionally saw the defendants around the upstairs apartments of this building. [Defendant]'s brother, Tony Garcia, told authorities that [defendant] lived in an upstairs apartment of a building that was on the west side of San Pablo Avenue. His description of the apartment's furnishings was consistent with the contents of apartment 201.

"Investigating officers obtained a warrant and searched apartment 201. A black Pacific Trail brand jacket, size extra large, a black pair of fingerless gloves, a scarf, and a navy cap were found. When an officer picked the jacket up off the couch, a spent .44-caliber shell casing fell out of it. Another .44-caliber expended cartridge casing was found laying on the floor. Officers found Perdomo's wallet in the bathroom. A payroll check payable to Javier Delgado Perdomo, a social security card in the name of Victor Delgado and a $1,000 peso bill were all floating in the toilet. A .44-caliber Desert Eagle brand semi-automatic pistol (the handgun) was found inside an air vent.

"On January 31, 2000, [defendant]'s mother gave authorities a letter that [defendant] had written to Detective Wells. The letter was redacted to remove references to Walker and admitted at trial. [Defendant] wrote that 'Only God can judge [him],' that, 'I asked him to forgive me. I prayed for the person and hope he is with God,' and that he cared 'about that person because I am not an evil person.'

"Criminalist Stephen O'Clair testified that the four bullet casings found at the murder scene and the bullet casing that was found on the floor of apartment 201 had all had been fired by the handgun. O'Clair compared the shoes defendants were wearing when they were detained with the shoe prints found at the murder scene. One of the shoe prints found at the crime scene was consistent in design and size with Walker's Nike brand shoes. Another of the shoe prints was consistent in design and size with

5.

[defendant]'s K-Swiss brand shoes. One of [defendant]'s shoes had a human bloodstain on it.

"Neither defendant testified. The defense did not call any witnesses." (*People v. Ortiz et al.*, *supra*, F037177, pp. 2–5.)

## DISCUSSION

### Statutory Background

Effective January 1, 2019, Senate Bill 1437 limited accomplice liability under the felony-murder rule[4] and the natural and probable consequences doctrine.[5] (§§ 188, 189, as amended by Stats. 2018, ch. 1015, §§ 2–3; *People v. Cruz* (2020) 46 Cal.App.5th 740, 755; *Lamoureux*, *supra*, 42 Cal.App.5th at p. 246.) The Legislature's purpose was " 'to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant of the underlying felony who acted with reckless indifference to human life.' (Stats. 2018, ch. 1015, § 1, subd. (f).) Senate Bill 1437 achieves these goals by amending section 188 to require that a principal act with express or implied malice and by amending section 189 to state that a person can only be liable for felony murder if (1) the 'person was the actual killer'; (2) the person

---

[4] Prior to Senate Bill 1437's enactment, " '[t]he felony-murder rule impute[d] the requisite malice for a murder conviction to those who commit[ted] a homicide during the perpetration of a felony inherently dangerous to human life.' " (*People v. Friend* (2009) 47 Cal.4th 1, 76.) Prior to Senate Bill 1437's enactment, specifically with respect to felony murder with robbery as the underlying felony, section 189, subdivision (a), stated, "All murder … that is committed in the perpetration of, or attempt to perpetrate, … robbery … is murder of the first degree."

[5] Prior to Senate Bill 1437's enactment, " ' "[a] person who knowingly aid[ed] and abet[ed] criminal conduct [was] guilty of not only the intended crime [target offense] but also of any other crime the perpetrator actually commit[ted] [nontarget offense] that [was] a natural and probable consequence of the intended crime." ' " (*People v. Chiu* (2014) 59 Cal.4th 155, 161.) " ' "[B]ecause the nontarget offense [was] unintended, the mens rea of the aider and abettor with respect to that offense [was] irrelevant and culpability [was] imposed simply because a reasonable person could have foreseen the commission of the nontarget crime." ' " (*People v. Lamoureux* (2019) 42 Cal.App.5th 241, 248 (*Lamoureux*).)

was an aider or abettor in the commission of murder in the first degree; or (3) the 'person was a major participant in the underl[y]ing felony and acted with reckless indifference to human life.' " (*People v. Cornelius* (2020) 44 Cal.App.5th 54, 57, review granted Mar. 18, 2020, S260410.)

"Senate Bill 1437 also [added section 1170.95, which] established a procedure permitting certain qualifying persons who were previously convicted of felony murder or murder under the natural and probable consequences doctrine to petition the courts that sentenced them to vacate their murder convictions and obtain resentencing on any remaining counts." (*Lamoureux*, *supra*, 42 Cal.App.5th at p. 246; § 1170.95, added by Stats. 2018, ch. 1015, § 4.) Under that procedure, a convicted person is eligible for relief if the following conditions are met: "(1) A complaint, information, or indictment was filed against the [defendant] that allowed the prosecution to proceed under a theory of felony murder or murder under the natural and probable consequences doctrine. [¶] (2) The [defendant] was convicted of first degree or second degree murder following a trial or accepted a plea offer in lieu of a trial at which the [defendant] could be convicted for first degree or second degree murder. [¶] (3) The [defendant] could not be convicted of first or second degree murder because of [the] changes to [s]ection 188 or 189 made effective January 1, 2019." (§ 1170.95, subd. (a)(1)–(3).)

When a facially sufficient petition alleging entitlement to relief pursuant to section 1170.95 is filed,[6] and the defendant requests counsel, the trial court must appoint counsel. (*People v. Lewis* (2021) 11 Cal.5th 952, 961–963 (*Lewis*).) The parties then file

---

[6] Such a petition must be filed in the court that sentenced defendant, give notice to the district attorney and defense counsel or the public defender, and include (1) a declaration by the defendant that he or she meets the eligibility requirements, (2) the superior court case number and year of conviction, and (3) whether the defendant requests appointment of counsel. (§ 1170.95, subd. (b)(1).) If any of the required content "is missing from the petition and cannot be readily ascertained," the court may deny the petition without prejudice. (*Id.*, subd. (b)(2).)

briefing and the court determines whether the defendant made "a prima facie showing that he or she is entitled to relief." (§ 1170.95, subd. (c); accord, *Lewis*, at pp. 957, 966.) The trial court's prima facie review is limited; "the court takes [the defendant]'s factual allegations as true and makes a preliminary assessment regarding whether the [defendant] would be entitled to relief if his or her factual allegations were proved." (*People v. Verdugo* (2020) 44 Cal.App.5th 320, 328, abrogated on other grounds by *Lewis* at pp. 961–963.) " '[A] court should not reject a [defendant's] factual allegations on credibility grounds without first conducting an evidentiary hearing.' " (*Lewis*, at p. 971.) "However, if the record, including the court's own documents, 'contain[s] facts refuting the allegations made in the petition,' then 'the court is justified in making a credibility determination adverse to the [defendant].' " (*Ibid.*) If the defendant has made "a prima facie showing that he or she is entitled to relief, the court [must] issue an order to show cause." (§ 1170.95, subd. (c).)

Within 60 days of issuance of an order to show cause, the trial court must "hold a hearing to determine whether to vacate the murder conviction and to recall the sentence and resentence the [defendant] on any remaining counts" (§ 1170.95, subd. (d)(1)) "unless the parties waive the hearing or the [defendant's] entitlement to relief is established as a matter of law by the record. (§ 1170.95, subd. (d)(2).)" (*People v. Drayton* (2020) 47 Cal.App.5th 965, 981, abrogated on other grounds by *Lewis*, *supra*, 11 Cal.5th at pp. 961–963.) At a hearing on the order to show cause, the burden of proof is "on the prosecution to prove, beyond a reasonable doubt, that the [defendant] is ineligible for resentencing." (§ 1170.95, subd. (d)(3)).

**Analysis**

The trial court denied defendant's petition before appointing counsel because, when it reviewed the record, it concluded that he was a major participant in the murder and therefore could have been convicted of first degree murder despite the changes to the law effected by Senate Bill 1437. The parties agree that the trial court erred in making

adverse factual determinations without first appointing counsel to represent defendant and conducting an evidentiary hearing. The parties further agree that the error was not harmless. We agree with the parties on both accounts.

As we explained above, when a facially sufficient petition alleging entitlement to relief pursuant to section 1170.95 is filed, and the defendant requests counsel, the trial court must appoint counsel. (*Lewis*, *supra*, 11 Cal.5th at pp. 961–963.) Here, the trial court went beyond merely reviewing the petition for facial sufficiency. It made factual findings, inferences, and credibility determinations from the record (which were adverse to defendant) regarding defendant's level of culpability. Such determinations should not have been made without first appointing counsel to represent defendant, permitting briefing, and affording defendant the opportunity for an evidentiary hearing pursuant to section 1170.95, subdivision (d)(3). Because defendant's petition was facially sufficient, the error was not harmless.

Therefore, as the parties agree, we must reverse the trial court's denial of defendant's section 1170.95 petition and remand the matter to the trial court. On remand, the People will bear the burden of proving beyond a reasonable doubt that defendant is ineligible for resentencing. (§ 1170.95, subd. (d)(3).)

We express no opinion on the merits of defendant's petition.

## **DISPOSITION**

The trial court's order denying defendant's section 1170.95 petition is reversed. The matter is remanded to the trial court.